711 F.2d 331
 229 U.S.App.D.C. 53, 1983-1 Trade Cases P 65,468
 CENTRAL VERMONT RAILWAY, INC., Canadian National Railway
Company, and Grand Trunk Western Railroad Company,
Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents
Delaware and Hudson Railway Company, Guilford Transportation
Industries, Inc., Intervenors.
 No. 82-2136.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 25, 1983.
Decided June 28, 1983.
 
 [229 U.S.App.D.C. 54] Petition for Review of an Order of the Interstate Commerce commission.
 Edward J. O'Meara, Attorney, I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, I.C.C., and John J. Powers, III and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 James E. Howard, with whom Kathleen D. Hendrickson and Jeffrey M. Goldsmith, Pittsburgh, Pa., were on the brief for intervenor, Guilford Transp. Industries, Inc.
 Kinga M. LaChapelle, Albany, N.Y., was on the brief for intervenor, Delaware and Hudson Ry. Co.
 Robert P. vom Eigen, Washington, D.C., with whom Charles A. Spitulnik, Washington, D.C., was on the brief, for petitioners.
 Before WILKEY and WALD, Circuit Judges, and BONSAL,* Senior District Judge for the Southern District of New York.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 We review here a decision of the Interstate Commerce Commission (ICC or Commission) approving unconditionally the merger of the Maine Central/Boston & Maine Railroad with the Delaware & Hudson Railroad. Guilford Transportation Industries--Control--Delaware & Hudson Railway, 366 I.C.C. 396 (1982) [hereinafter cited as Delaware & Hudson Merger ].[1] Petitioner Canadian National, a competitor of the Delaware & Hudson, asked the ICC to protect it from competitive harm due to the merger by requiring the merged entity to provide Canadian National with trackage rights over a major north-south route.[2] The ICC declined to impose this protective condition, finding that the condition was not needed to preserve competition because there would still be effective truck competition and that Canadian National had not shown that the condition was needed to prevent harm to "essential services."
 
 
 2
 Canadian National appeals to this court, claiming that the ICC misanalyzed the effect of the merger on competition among rail carriers and that the ICC's "essential services" test for imposing protective conditions is too strict and does not comply with the statutory directive that the ICC consider the effect of the merger on "adequacy of transportation to the public." 49 U.S.C. § 11, 344(b)(1)(A). We affirm the Commission's determination that protective conditions are unnecessary because there exists effective truck competition.
 
 I. BACKGROUND
 
 3
 The companion case to this one, Lamoille Valley Railroad v. ICC, 711 F.2d 295, 300-302 (D.C.Cir.1983) describes the statutory scheme governing mergers of two "class I" railroads and the ICC's policies on [229 U.S.App.D.C. 55] such mergers.[3] We incorporate that discussion by reference and pass on to the facts and issues involved in this case.
 
 A. The Railroads Involved in this Case
 
 4
 Guilford Transportation Industries (Guilford) is a holding company that is 100% owned by Timothy Mellon. Guilford already owns the Maine Central Railroad and we approve today, in Lamoille Valley, Guilford's acquisition of the Boston & Maine Railroad.
 
 
 5
 Canadian National operates joint north-south service (from Montreal to New York and points south) with the Boston & Maine. Canadian Pacific also operates north-south service jointly with the Boston & Maine. Conrail and the Delaware & Hudson operate competing north-south routes.
 
 
 6
 In addition to its north-south service, Canadian National operates east-west service from Maine to the midwest in competition with Canadian Pacific and with a joint Boston & Maine/Delaware & Hudson route. All three lines connect with the Maine Central near Portland, Maine.
 
 
 7
 The Maine Central is a profitable railroad with a near-monopoly over rail service to the Maine paper and forest products industries. Prior to its acquisition by Guilford, the Boston & Maine was bankrupt. The Delaware & Hudson is all but bankrupt, kept out of bankruptcy proceedings only by continuing subsidies from the federal government and the state of New York. The Canadian National and the Canadian Pacific are large and profitable transcontinental railroads.
 
 B. Proceedings Below
 
 8
 On January 29, 1982, Guilford applied to the ICC for permission to acquire the Delaware & Hudson. Its application was contingent on the Commission's prior approval of Guilford's proposal to acquire the Boston & Maine. Guilford's plan to make the Delaware & Hudson profitable depended in part on diverting north-south traffic from the joint Canadian National/Boston & Maine and Canadian Pacific/Boston & Maine lines to the Delaware & Hudson line and diverting east-west traffic from the Canadian lines to the Boston & Maine/Delaware & Hudson east-west line.
 
 
 9
 Canadian National did not oppose the overall merger of the Maine Central and the Boston & Maine with the Delaware & Hudson. It was concerned, however, that Guilford might seek to increase traffic diversion from the Boston & Maine/Canadian National north-south route to the competing Delaware & Hudson route by allowing the Boston & Maine's north-south service to deteriorate. This would reduce the time advantage of the Boston & Maine/Canadian National route over the Delaware & Hudson route. Canadian National therefore requested trackage rights over the Boston & Maine's portion of the Boston & Maine/Canadian National Line.
 
 
 10
 Canadian National also argued to the Commission that, after acquiring the Delaware & Hudson, Guilford will have an incentive to delay the interchange of traffic between the Maine Central and the Canadian National. This would reduce the time advantage of Canadian National's east-west route and permit Guilford to increase traffic diversion from the Canadian National route to the competing Boston & Maine/Delaware & Hudson route. Canadian National therefore asked the ICC to require Guilford to maintain current interchange service at Danville and Yarmouth Junctions, Maine, where it exchanges traffic with the Maine Central.[4]
 
 
 11
 The ICC approved the merger and denied Canadian National's request for protective [229 U.S.App.D.C. 56] conditions. It found that the "primary public benefit" from the merger was "the lifeline it will provide to the ailing D & H," without which it was "unlikely that D & H could continue to operate in light of its continuing losses and negative cash flow." Delaware & Hudson Merger, 366 I.C.C. at 400-01.
 
 
 12
 The Commission recognized that the merger would reduce north-south rail competition because Guilford would participate in three of the four available routings. It did not view this as a serious problem, however, because of effective truck competition--"all the [north-south] traffic ... is potentially subject to diversion to motor carriage." Id. at 407. Moreover, the Boston & Maine's north-south line (the Connecticut River line, which runs through Massachusetts and Connecticut) and the Delaware & Hudson's line (which lies west of the Hudson River in New York) were "not perfect substitutes for each other." Id. at 408. With regard to possible downgrading of the Boston & Maine's portion of the joint Boston & Maine/Canadian National north-south line, the Commission found that service over that line "cannot be deemed essential" because truck service was available. Id. at 420.
 
 
 13
 As for possible downgrading of interchange service at Danville and Yarmouth Junctions, the Commission had already addressed that issue in its Boston & Maine decision. Its reasons for denying relief in that decision--principally Guilford's lack of intent to downgrade and Canadian National's competitive leverage--were "equally applicable here." Id. at 419.
 
 C. Issues Presented
 
 14
 Canadian National argues that the ICC misanalyzed the anticompetitive effects of the merger and Guilford's incentives to downgrade the Boston & Maine's north-south service and the Danville and Yarmouth Junction interchanges.[5] Intervenors Guilford and Delaware & Hudson support the ICC's decision. For the reasons given in Lamoille Valley, 711 F.2d at 315-323, we conclude that the Commission failed adequately to explain why Guilford would not downgrade service at Danville and Yarmouth Junctions. We therefore remand to the Commission on this issue. With regard to north-south service, we affirm the Commission's conclusion that the merger will neither substantially reduce competition nor affect essential services.
 
 
 15
 II. THE MERGER'S EFFECT ON NORTH-SOUTH RAIL SERVICE
 
 
 16
 We incorporate by reference the statement of the standard of review in Lamoille Valley, 711 F.2d at 301 n. 3, 307-308, and pass on to analysis of the ICC's denial of Canadian National's request for north-south trackage rights.[6]
 
 
 17
 As discussed in Lamoille Valley, 711 F.2d at 302, 310 the Commission will consider imposing conditions on a merger for two reasons--to prevent significant reduction in competition and to preserve "essential services." The Commission found that [229 U.S.App.D.C. 57] neither reason for imposing conditions was present here. We agree.
 
 A. Anticompetitive Effects
 
 18
 The Commission found that Guilford's participation in three of the four north-south routes would not have serious anticompetitive consequences because there was strong truck competition. The presence of truck competition limited the importance of reduction in rail competition. See Delaware & Hudson Merger, 366 I.C.C. at 407 ("A change in the number of rail competitors is less significant where there is strong motor carrier competition ...."). Also, truck competition would make it impractical for Guilford to seek to divert traffic to the Delaware & Hudson by downgrading service on Boston & Maine's north-south line:
 
 
 19
 The extent to which any rail carrier can exercise control over traffic is greatly diminished in the face of intense motor carrier competition. If rail carriers want to preserve traffic in these circumstances, they cannot afford to favor inefficient routes over efficient ones, even if this means that they will not preserve their longest possible haul.
 
 
 20
 Id. at 409. Canadian National raises several objections to this analysis.
 
 1. Including Trucks in the Product Market
 
 21
 First, Canadian National argues that the Commission improperly relied on truck competition to ameliorate the substantial lessening of rail competition caused by the merger. It would have the Commission focus exclusively on rail competition. In antitrust terms, the Commission, in effect, defined the relevant product market as "transportation of freight," while Canadian National argues that "[t]he product [market] is the transportation of goods by rail only."[7] We believe the Commission properly considered truck competition.
 
 
 22
 The Interstate Commerce Act broadly instructs the ICC to determine if a merger is "consistent with the public interest." 49 U.S.C. § 11,344(c). Canadian National relies on Congress' instruction to the Commission to "consider," in making that public interest determination, "whether the proposed transaction would have an adverse effect among rail carriers in the affected region." Id. § 11,344(b)(1)(E) (emphasis added).[8]
 
 
 23
 Section 11,344(b)(1) also, however, permits the Commission to consider factors other than those specifically listed; it provides that "the Commission shall consider at least the following ...." (Emphasis added.) The legislative history of § 11,344(b)(1)(E) confirms that the subsection merely codifies prior ICC practice and does not restrict the factors that the ICC may consider. As Congressman Panetta explained in introducing the provision as a floor amendment to the Staggers Rail Act of 1980:
 
 
 24
 My amendment is not intended to in any way tie the hands of the ICC on the question of mergers.... [C]ompetition plays an important role in the Commission's decisionmaking on railroad mergers. This is as it should be. My amendment would insure that this remains the case.
 
 
 25
 126 Cong.Rec. H8604 (daily ed. Sept. 9, 1980).
 
 
 26
 Thus, the Commission may consider "intermodal" competition between truck and [229 U.S.App.D.C. 58] rail, so long as it also considers "intramodal" competition among rail carriers. Accord Gilbertville Trucking Co. v. United States, 371 U.S. 115, 127, 83 S.Ct. 217, 224, 9 L.Ed.2d 177 (1962) ("The statute entrusts the Commission with the duty to decide what considerations other than those specifically mentioned ... should be given weight.").
 
 
 27
 The only remaining question is whether the Commission has authority to give dominant weight to rail-truck competition, as it did when it concluded that reduction in competition among rail carriers is of little moment in light of vigorous rail-truck competition. We hold that the Commission has this power.
 
 
 28
 As a general rule, when a statute requires an agency to "consider" a factor, the agency must reach "an 'express and considered conclusion' about the bearing of [the factor], but need not give 'any specific weight' to th[e] factor." Small Refiner Lead Phase-Down Task Force v. United States Environmental Protection Agency, 705 F.2d 506, 516 (D.C.Cir.1983) (Clean Air Act) (quoting Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1045 (D.C.Cir.1978) (Clean Water Act)). In this case, the ICC properly considered the relevance of competition among rail carriers, explaining that:
 
 
 29
 A change in the number of rail competitors is less significant where there is strong motor carrier competition which prevents carriers from obtaining and exploiting monopoly power.
 
 
 30
 Delaware & Hudson Merger, 366 I.C.C. at 407.
 
 
 31
 We think it appropriate to follow that general rule here. A major impetus behind the deregulation of railroads in the Staggers Rail Act of 1980 was Congress' recognition that railroads generally had to compete with other modes of transportation. See, e.g., H.R.Rep. No. 1430 (Conf.Rep.), 96th Cong., 2d Sess. 79 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4110:
 
 
 32
 [H]istorically the enactment of the Interstate Commerce Act was essential to prevent an abuse of monopoly power by railroads .... However, today, most transportation is competitive and many of the Government regulations affecting railroads have become unnecessary and inefficient. Nearly two-thirds of intercity freight is transported by modes of transportation other than railroads.
 
 
 33
 If Congress can rely on truck-rail competition to obviate the need for regulation, surely the ICC can do so as well. This is especially so in light of the congressional policy "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. § 10,101a(2).
 
 
 34
 Moreover, in considering truck-rail competition, the ICC was following the accepted antitrust definition of a "product market": Two products belong in a single product market if they are "regarded by consumers as ... close substitutes." 2 P. Areeda & D. Turner, Antitrust Law p 52a (1978).[9] If truck and rail transport are good substitutes for each other in the Montreal-to-New York corridor, it makes no sense in terms of antitrust policy to treat them, as Canadian National wants to, as if they were not. We will not lightly impute to Congress an intent to foreclose the ICC from following the antitrust principles incorporated in the antitrust laws.[10]
 
 2. The Existence of Truck Competition
 
 35
 Canadian National also disputes whether trucks in fact provide strong competition in [229 U.S.App.D.C. 59] the Montreal-to-New York corridor. We think that substantial evidence supports the Commission's finding that they do.
 
 
 36
 The Commission explained that it relied both on analysis of the principal commodities carried by the Delaware & Hudson and on testimony by shippers:
 
 
 37
 The commodities the D & H and B & M carry over these routes are generally commodities for which rail service is not considered market dominant. [Guilford] submitted verified statements from [three] shippers of pulp and paper which it serves. [The shippers] all testify that there is motor carrier competition for this traffic.
 
 
 38
 Delaware & Hudson Merger, 366 I.C.C. at 407. Canadian National correctly notes that two of the three shippers cited by the Commission are Maine paper companies who appear to use mostly the Boston & Maine/Delaware & Hudson east-west route.[11] Thus, only one shipper could testify directly to the existence of truck competition for north-south freight movement.
 
 
 39
 Even Canadian National's witnesses, however, admitted the existence of some truck competition.[12] Moreover, Canadian National apparently concedes that rail service is not "market dominant," i.e., that the commodities now carried by rail are susceptible to truck competition. See Canadian National Brief at 21 n. 23. Finally, the ICC could properly rely, as Congress did in deregulating railroad rates in 1980, on the well-known fact that railroads carry only about one-third of all intercity freight and that "the railroads' decline in market share seems to cut across ... almost every commodity group."[13] Putting these various pieces together, we find sufficient support for the ICC's finding that there is pervasive truck competition for north-south traffic.
 
 3. Geographic Market
 
 40
 Canadian National also contends that the ICC misanalyzed the relevant "geographic market" within which competitive effects must be assessed. It points to the ICC's statement that the Delaware & Hudson line and the Canadian National line "serve different geographic markets and are not perfect substitutes for each other." Delaware & Hudson Merger, 366 I.C.C. at 408. Canadian National argues that if the two lines compete for the same traffic, they are necessarily in the same "geographic market" as that term is used in antitrust analysis.[14]
 
 
 41
 This looks to us to be no more than a semantic quibble. Concededly, the Commission used the term "geographic market" loosely. The two rail lines are in separate geographic markets only for local traffic, and are in the same geographic market for most long-haul traffic. But the ICC unquestionably recognized this. In the same sentence in which the phrase "geographic market" appears, the Commission explained that the two lines were not "perfect" substitutes; it did not say that they were not [229 U.S.App.D.C. 60] substitutes at all. Elsewhere in its decision, the ICC stated that the lines "compete for ... overhead traffic." Indeed, if the two lines really served entirely separate geographic markets, the Commission's whole analysis of anticompetitive effects would have been pointless.
 
 
 42
 In sum, we find reasonable the Commission's reliance on truck competition to mitigate any reduction in rail competition.[15]
 
 B. Essential Services
 The ICC defines "essential services" as:
 
 43
 A service is essential if there is a sufficient public need for the service and adequate alternative transportation is not available.
 
 
 44
 49 C.F.R. § 1180.1(c)(2)(ii) (1982). The Commission concluded that Canadian National's north-south service did not warrant protective conditions because it was not "essential." Canadian National challenges that conclusion.[16]
 
 
 45
 The ICC explained that Canadian National's "overhead" service ("overhead" freight is freight that neither originates nor terminates on a particular line) was not essential "because there are other routes over which the traffic can move." Delaware & Hudson Merger, 366 I.C.C. at 420. As for Canadian National's local service, Canadian National had developed no evidence that this service was essential either:
 
 
 46
 [Canadian National] has not shown that any of the shippers located on its line cannot be served by truck. Nowhere in the record has it been shown that any of the customers would go out of business if [Canadian National's] rail service would be terminated. There is absolutely no evidence with regard to prevailing rates in its corridors. There is no analysis as to whether the commodities carried are market dominant commodities. Thus the service it provides cannot be deemed essential.
 
 
 47
 Id.
 
 
 48
 We understand the Commission to be suggesting several types of evidence that Canadian National might have offered, but did not, to show that alternate service was inadequate: evidence on "prevailing rates" for rail and truck service; evidence on whether rail service is "market dominant" for the commodities that Canadian National carries; and evidence on whether shippers would go out of business if they lose rail service. Canadian National does not object to the ICC's assessment of the evidence.[17] It asserts that the Commission should have required Guilford to prove that alternate service was adequate, instead of requiring Canadian National to prove that alternate service was inadequate.[18]
 
 
 49
 We have no trouble upholding the Commission's approach. Especially in an expedited proceeding such as this one,[19] the Commission can reasonably expect a party seeking protective conditions to make a prima facie case on why it needs them. Prevailing rates are obviously relevant to the question whether truck service is an adequate substitute for rail. Market dominance is also clearly relevant. If rail service is not market dominant for a particular commodity, that suggests that most shippers [229 U.S.App.D.C. 61] who ship or receive that commodity can switch to truck without incurring serious harm. Cf. 49 U.S.C. § 10,709(a) (" 'market dominance' means an absence of effective competition from other carriers or modes of transportation").
 
 
 50
 The Commission's reference to shippers being forced out of business is more troublesome. We hold today in Lamoille Valley, 711 F.2d at 310-313, that the Commission cannot equate the ability of shippers to stay in business with the existence of adequate alternative transportation. But adequacy is a matter of degree. The fact that no shippers will go out of business, although insufficient to prove that alternate service is adequate, is relevant evidence on the question of adequacy because it places a rough upper limit on the cost difference between truck and rail. Thus, the Commission did not err in giving at least some weight to this factor.
 
 
 51
 In sum, the ICC reasonably concluded that Canadian National failed to establish a significant probability that its services were essential.[20]
 
 III. CONCLUSION
 
 52
 The ICC reasonably concluded that Canadian National's north-south rail service is neither essential to local shippers nor needed to provide effective competition to Guilford's north-south service. For the reasons given in Lamoille Valley, we remand on the issue of downgrading of interchange service at Danville and Yarmouth Junctions, Maine. In all other respects, the Commission's decision approving Guilford's acquisition of the Delaware & Hudson and denying Canadian National's request for protective conditions is affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 The ICC had previously approved the merger of the Maine Central with the Boston & Maine. Guilford Transp. Indus.--Control--Boston & Me. Corp., 366 I.C.C. 292 (1982) [hereinafter cited as Boston & Maine Merger ]. We review the ICC's decision concerning that merger in a companion case to this one, also issued today. Lamoille Valley R.R. v. ICC, 711 F.2d 295 (D.C.Cir.1983)
 
 
 [2]
 Canadian National's co-petitioners--Central Vermont Railway and Grand Trunk Western Railroad--are wholly-owned subsidiaries of Canadian National. We use the name "Canadian National" to refer to any and all of these railroads
 
 
 [3]
 The ICC defines "class I" railroads as those railroads with annual operating revenues of $50 million or more. 49 C.F.R. § 1240.1(a) (1982). Under that definition, the Maine Central, the Boston & Maine, and the Delaware & Hudson are all class I railroads
 
 
 [4]
 Canadian Pacific also sought protective conditions before the ICC and petitioned this court for review, but later made its separate peace with Guilford and withdrew its petition for review. Conrail also sought various conditions before the ICC but did not petition this court for review
 
 
 [5]
 Canadian National raises one other claim that was addressed in Lamoille Valley and can be disposed of quickly. Canadian National argues that the expedited procedural schedule used by the ICC in considering the merger was a "rule" within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 551(4), 553, and was improperly issued without notice and comment. For the reasons given in Lamoille Valley, 711 F.2d at 326-329, we hold that the schedule is exempt from the APA's notice and comment requirements as a "rule[ ] of agency ... procedure." 5 U.S.C. § 553(b)(A)
 
 
 [6]
 The ICC asserts that since the Northeast Rail Service Act of 1981 (NERSA), § 1164(a), 45 U.S.C. § 1112(b), required the ICC to issue a decision on Guilford's proposal to acquire the Delaware & Hudson within 180 days "with or without a hearing," a hearing was not required by statute and therefore the standard of review is "arbitrary and capricious," 5 U.S.C. § 706(2)(A), rather than "substantial evidence," id. § 706(2)(E). We need not decide whether Congress, in enacting NERSA, meant to change the well-established substantial evidence standard for review of ICC merger decisions, for any possible difference between the two standards of review would not affect our decision in either this case or Lamoille Valley
 
 
 [7]
 Canadian National Brief at 35 (emphasis added)
 
 
 [8]
 49 U.S.C. § 11,344(b)(1) provides:
 In a proceeding under this section which involves the merger or control of at least two class I railroads ..., the Commission shall consider at least the following:
 (A) the effect of the proposed transaction on the adequacy of transportation to the public.
 (B) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.
 (C) the total fixed charges that result from the proposed transaction.
 (D) the interest of carrier employees affected by the proposed transaction.
 (E) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region.
 
 
 [9]
 See also Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use ... between the product itself and substitutes for it.") (footnote omitted); Union Pac. Corp.--Control--Missouri Pac. Corp., 366 I.C.C. 459, 503-04 (1982) (applying the Brown Shoe definition of product market), appeal filed sub nom. Southern Pac. Transp. Co. v. ICC, No. 82-2253 (D.C.Cir. argued June 6, 1983)
 
 
 [10]
 We hold only that the ICC may evaluate anticompetitive effects in terms of the "product markets" and "geographic markets" used in antitrust law, not that it must do so. See Seaboard Air Line R.R. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965) (per curiam) (ICC need not directly apply antitrust analysis in reviewing a rail merger)
 
 
 [11]
 See Verified Statement of Robert Ricker, Transportation Manager, Georgia-Pacific Corp., at 2 (Jan. 8, 1982), reprinted in Joint Appendix (J.A.) at 133, 134; Verified Statement of Charles Hill, Staff Transportation Manager, Scott Paper Co., at 4 (Jan. 13, 1982), J.A. at 135, 136
 
 
 [12]
 Verified Statement of Robert Walker, Assistant Vice President, Grand Trunk Western Railroad, at 7-8 (Mar. 29, 1982), J.A. at 137, 143-44 ("Although motor carriers are a factor in this market, railroads have a decided advantage ...." ); Supplemental Verified Statement of Phillip Larson, General Manager, Central Vermont Railway, at 14 (May 19, 1982), J.A. at 214, 227 (for most poultry growers on Canadian National's line, there is "no alternative to [rail] service other than higher priced motor carrier shipments")
 One shipper who testified in favor of Canadian National's proposal was even more explicit. See Verified Statement of Allan Baldwin, Traffic Manager, Erwing Paper Mills, at 2 (Mar. 23, 1982), J.A. at 184, 185 ("faster truck service has already resulted in the loss of much rail business to truckers").
 
 
 [13]
 H.R.Rep. No. 1035, 96th Cong., 2d Sess. 38 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 3983
 
 
 [14]
 The ultimate test for inclusion of two producers in a market, whether "product" market or "geographic" market, is reasonable substitutability of use. See 2 P. Areeda & D. Turner, Antitrust Law p 518 (1978); United States v. Marine Bancorp., 418 U.S. 602, 619, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974)
 
 
 [15]
 In light of this conclusion, we need not address Canadian National's claim that the Commission underestimated the extent to which the merger would reduce rail competition
 
 
 [16]
 In addition to challenging the "essential services" test as applied in this case, Canadian National argues that the test, on its face, is inconsistent with the Interstate Commerce Act. We uphold the facial validity of the essential services test for the reasons given in Lamoille Valley, 711 F.2d at 309, 310
 
 
 [17]
 In support of its request for trackage rights, Canadian National submitted only conclusory statements by shippers that its service was "essential." See, e.g., Verified Statement of Leonard Morrill, Traffic Manager, A.D. Pease Grain Co., at 1 (Mar. 25, 1982), J.A. at 182, 182; Verified Statement of William Felmly, Director of Transportation, Saxon Industries, at 2 (Mar. 26, 1982), J.A. at 190, 191
 
 
 [18]
 See Canadian National Reply Brief at 10
 
 
 [19]
 Congress had ordered the ICC to decide the Delaware & Hudson's merger application within 180 days, as compared to the normal 31-month merger proceeding. See note 5 supra; Lamoille Valley, 711 F.2d at 326, 327
 
 
 [20]
 In light of this conclusion, we need not reach Canadian National's claim that losses due to traffic diversion will force it to abandon its current north-south service. However, to the extent that the ICC focused on whether diversion losses were a large percentage of Canadian National's gross revenues rather than on the future profitability of Canadian National's north-south line, see Delaware & Hudson Merger, 366 I.C.C. at 419-20, we have disapproved that analysis in Lamoille Valley, 711 F.2d at 316-317