Donna L. NICHOLS, et al., Appellants,

v.

**BOARD OF TRUSTEES OF the
ASBESTOS WORKERS LOCAL
24 PENSION PLAN, et al.**

No. 82–1959.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 3, 1983.

Decided Sept. 24, 1987.

Opinions Filed Dec. 11, 1987.

Daniel M. Schember, with whom Katharyn M. Marks and James B. Klimaski, Washington, D.C., were on brief, for appellants.

Michael J. Roach, Atty., Dept. of Justice, with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Michael L. Paup, Atty., Dept. of Justice, Washington, D.C., were on brief, for federal appellees.

Thomas P. McErlean, Washington, D.C., for appellee Board of Trustees of Asbestos Workers Local 24 Pension Plan. James Buckley Ostmann, Washington, D.C., also entered an appearance for the Board.

Before ROBINSON and STARR, Circuit Judges and WRIGHT,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge ROBINSON.

Dissenting Opinion filed by Circuit Judge STARR.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In May, 1979, the board of trustees of the Asbestos Workers Local 24 Pension Plan proposed amendments designed to effect a retroactive decrease in the plan's retirement benefits. The Internal Revenue Service (IRS) approved the amendments shortly thereafter. Three adversely-affected retirees then filed suit in the District Court to block the amendments, contending that Section 302(c)(8) of the Employee Retirement Income Security Act (ERISA)[1] prohibits retroactive alteration of the Plan, that the trustees' action flouted statutorily-prescribed fiduciary duties, and that agency approval of the benefit reduction was arbitrary and procedurally deficient. On cross-motions for summary judgment, the District Court dismissed the case, concluding that neither the trustees, IRS, nor the plan amendments themselves transgressed ERISA or any other applicable provision of law.

■ We find that IRS approved and thereby validated the benefit decrease on the basis of deliberations plainly inadequate to satisfy ERISA's specific, unequivocal requirements. We therefore vacate the judgment appealed from and remand to the District Court with instructions to return the case to IRS for appropriate further proceedings.

## I

The Asbestos Workers Local 24 Pension Plan is a defined-benefit, multiemployer program established pursuant to a collective-bargaining agreement between the Insulation Contractors Association of Washington, D.C., Inc., and the Asbestos Workers Local No. 24 of the International Association of Heat and Frost Insulators.[2] In 1977, the plan entitled eligible participants to monthly retirement benefits of $16.80

---

* Senior Circuit Judge Wright concurred in the judgment issued on September 24, 1987, in this case, and in the majority opinion prior to his retirement from judicial service.

1. Pub.L. No. 93–406, tit. I, § 302(c)(8), 88 Stat. 829, 872 (1974) (codified at 29 U.S.C. § 1082(c)(8) (1982)). This litigation also implicates ERISA's § 1013(a), Pub.L. No. 93–406, tit. II, § 1013(a), 88 Stat. 829, 914 (1974) (codified at 26 U.S.C. § 412(c)(8) (1982)), which is worded similarly. These sections originally required plan administrators to submit proposed retroactive plan amendments for the Secretary of Labor's approval. See Part III(A) infra. However, by § 101(a)–(b) of Reorganization Plan No. 4 of

1978, reprinted in 5 U.S.C. app. at 1163 (1982) and in 29 U.S.C. § 1001 at 1106 (1982), the President delegated this authority to the Secretary of the Treasury, in whose stead IRS acted in this case.

2. See Amended Complaint ¶ 10, Nichols v. Board of Trustees, No. 80–0563 (D.D.C.) (filed Oct. 16, 1980), Record Document (R.Doc.) 29 at 4, reprinted in Appendix for Appellants (A.App.) at 11; see also Collective Bargaining Agreement, at 6 art. X, ¶ B, Exhibit P in appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, Nichols v. Board of Trustees, No. 80–0563 (D.D.C.) (filed Aug. 18, 1981), R.Doc. 75.

for each year of service in covered employment.[3] On April 12, 1977, the trustees increased the monthly benefit for plan participants retiring after October 1, 1977, to $24.80 per credit year.[4] Ernest Nichols, Raymond Bell, and Ralph Tomlin, who later became the plaintiffs herein, fell within the category, and qualified for and received monthly payments at the higher level.[5]

The plan did not fare well during the two years following this change. The number of hours worked annually in covered employment declined markedly, and a significant number of plan participants unexpectedly elected early retirement. At the then-existing contribution rate and benefit level, this combination of factors resulted in substantial unfunded plan liabilities.[6] To secure the plan's financial viability, and to enhance the prospect of a merger with the larger and potentially more stable National Asbestos Workers Pension Plan, the trustees, on May 30, 1979, adopted amendments repealing the 1977 monthly benefit retroactively to July 1, 1977, and reinstating the previous monthly benefit of $16.80

per credit year.[7] The amendments mandated recalculation of pensioners' retirement payments at the lower level and thus pared their monthly benefits by approximately one-third.[8]

The benefit reduction did not become effective immediately because Section 302(c)(8) of ERISA[9] requires retroactive amendments to qualifying plans to be cleared with IRS. The trustees submitted the amendments and supporting materials to IRS on September 21, 1979,[10] and IRS formally approved them on December 17 following.[11] This removed the statutory impediment to their implementation by the trustees, and thereupon retirees' monthly payments under the plan decreased.[12]

Nichols' repeated efforts to obtain relevant information from the trustees and to participate in the IRS review of the plan amendments met with resistance and refusal. Before the trustees submitted the amendments to IRS, Nichols twice sought a copy of the accompanying materials.[13] The trustees not only rejected each request,[14]

3. See Nichols v. Board of Trustees, No. 80–0563 (D.D.C. July 19, 1982) (memorandum opinion), R.Doc. 87 at 1, A.App. 31.

4. Id. at 1–2, A.App. 31–32. Upon his retirement in 1978, Nichols thus was entitled under the amendment to $925.04 per month. See Affidavit of Ernest Nichols, Nichols v. Board of Trustees, No. 80–0563 (D.D.C.) (filed Feb. 29, 1980), R.Doc. 2 at 3, A.App. 20; Brief for Federal Appellees at 12.

5. See Amended Complaint, supra note 2, ¶ 11, R.Doc. 29 at 4, A.App. 11.

6. See Preliminary Analysis of Actuarial Position of Asbestos Workers Local No. 24 Pension Plan Prepared by Hewitt Associates at 11, Exhibit BB in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, supra note 2, R.Doc. 75; Application for Approval of Retroactive Plan Amendment Reducing Accrued Benefits at 3–5, Exhibit U in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, supra note 2, R.Doc. 75.

7. See Minutes of Special Meeting of the Board of Trustees of the Asbestos Workers Local 24 Pension Plan, Exhibit S in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, supra note 2, R.Doc. 75.

8. Under the 1979 amendment, Nichols received $626.64 per month. See Affidavit of Ernest

Nichols, supra note 4, R. Doc. 2 at 3, A. App. 20; Brief for Federal Appellee at 12.

9. 29 U.S.C. § 1082(c)(8) (1982). See note 1 supra.

10. See Letter from Board of Trustees of Asbestos Workers Local No. 24 Pension Fund to Internal Revenue Service (Sept. 21, 1979), Exhibit R in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, supra note 2, R.Doc. 75; see also note 7 supra.

11. See Letter from Ira Cohen to Thomas P. McErlean (Dec. 17, 1979), Exhibit A in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, supra note 2, R.Doc. 75.

12. See Amended Complaint, supra note 2, ¶ 11, R.Doc. 29 at 4, A.App. 11.

13. Letter from Ernest Nichols to Asbestos Workers Local No. 24 Pension Fund (July 10, 1979), Exhibit 2 to Amended Complaint, supra note 2, A.App. 21; Letter from James Klimaski to L.E. Laurion (Aug. 30, 1979), Exhibit 4 to Amended Complaint, supra note 2, A.App. 23.

14. Letter from L.E. Laurion to Ernest Nichols (July 26, 1979), Exhibit 3 to Amended Complaint, supra note 2, A.App. 22; Letter from L.E. Laurion to James Klimaski (Sept. 5, 1979), Exhibit 5 to Amended Complaint, supra note 2,

but did not even notify Nichols individually when, much later, they made duplicates available for inspection or purchase.[15] Nichols' attempts to procure copies from IRS and to intervene in the agency's Section 302(c)(8) proceeding for review of the amendments [16] proved similarly futile; IRS denied the request for the materials [17] and simply ignored the query respecting participation.[18] Nichols obtained the requested documents from the trustees on January 9, 1980,[19] three weeks after IRS, without his input, approved the amendments and sanc-

tioned the benefit decrease he had hoped to forestall.

## II

Unable to defeat the benefit rollback by administrative means, Nichols, later joined by Bell and Tomlin, filed suit in the District Court [20] for declaratory and injunctive relief against the trustees and IRS.[21] They contended that the amendments were invalid because the trustees, by adopting them,[22] by denying Nichols' information request,[23] by submitting incomplete financial

---

A.App. 24. We infer the trustees' denial of Nichols' second request from their failure to respond notwithstanding their promise to consider Nichols' request and to advise him of their decision on whether to grant it. See Letter from L.E. Laurion to James Klimaski (Sept. 5, 1979), *supra*. Nichols received no further communication from the trustees in regard to his inquiry. See Amended Complaint, *supra* note 2, ¶ 21, R.Doc. 29 at 5, A.App. 12.

**15.** See Affidavit of Ernest Nichols, *supra* note 4, R.Doc. 2 at 2, A.App. 19. The trustees announced the availability of the materials for examination or purchase in a notice appearing in the December 8, 1979 issue of an industry newsletter. See *The Washington Building Craftsman*, vol. 4, no. 48 (Dec. 8, 1979) at 4, *reprinted as* Exhibit NN in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, *supra* note 2, R.Doc. 75. The notice stated that

[t]he IRS submission is available for examination at the Fund Office during regular hours by prior appointment, and that [*sic*] a copy may be purchased at the Trustees' most [*sic*] of $37.50 provided a written request and payment is [*sic*] received in the Fund Office prior to 14 December 1979. Payment should be by money order or cashier's check; if payment is by personal check, that check must clear the bank before the material is released.

*Id.* This notice, published more than a month after authorization of the submission by the trustees, see *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 3, A.App. 33, appeared only nine days before IRS approved the amendments that it concerned. Furthermore, the obscurity of the notice may have exacerbated the strict conditions imposed upon access to the materials: the notice was buried beneath birth, birthday and hospital announcements in a trade newsletter and did not identify the amendments with specificity.

**16.** See Amended Complaint, *supra* note 2, ¶¶ 25, 32, R.Doc. 29 at 5, 6, A.App. 12, 13; see also Letter from James Klimaski to Winfield Burley (Sept. 6, 1979), Exhibit 6 to Amended Complaint, *supra* note 2, A.App. 25.

**17.** See Letter from Internal Revenue Service to James Klimaski (Oct. 30, 1979), Exhibit 7 to Amended Complaint, *supra* note 2, A.App. 26. This denial was challenged before the District Court as an infringement of Nichols' right under § 552(a)(3) of the Freedom of Information Act, 5 U.S.C. § 552(a)(3) (1982), see Amended Complaint, *supra* note 2, ¶ 44, R.Doc. 29 at 7, A.App. 14, but this contention has not been pressed on appeal.

**18.** See Amended Complaint, *supra* note 2, ¶ 33, R.Doc. 29 at 6, A.App. 13; Brief for Federal Appellees at 12.

**19.** See Amended Complaint, *supra* note 2, ¶ 21, R.Doc. 29 at 5, A.App. 12.

**20.** See Amended Complaint, *supra* note 2. Although their amended complaint styled the litigation as a class action, *id.* ¶ 1, R.Doc. 29 at 2, A.App. 9, they apparently did not seek class-action certification under Fed.R.Civ.P. 23(c).

**21.** Plaintiffs also requested attorneys' fees under § 502(g) of ERISA, Pub.L. No. 93–406, tit. I, 88 Stat. 829, 892 (1974) (codified as amended at 29 U.S.C. § 1132(g) (1982)), and § 552(a)(4)(E) of the Freedom of Information Act, Pub.L. No. 93–502, 88 Stat. 1562 (1974) (codified at 5 U.S.C. § 552(a)(4)(E) (1982)). Amended Complaint, *supra* note 2 ¶ 18, (prayer for relief), R.Doc. 29 at 10, A.App. 17. The District Court denied the claim, see *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 18–19, A.App. 48–49, and it has not been advanced on this appeal.

**22.** See Plaintiffs' Memorandum in Response to Defendant Board of Trustees' Motion for Summary Judgment, *Nichols v. Board of Trustees*, No. 80–0563 (D.D.C.) (filed Sept. 11, 1981), R.Doc. 76 at 6–9.

**23.** See Amended Complaint, *supra* note 2, ¶¶ 18–21, 43, R.Doc. 29 at 4–5, 7, A.App. 11–12, 14.

data to IRS,[24] and by failing to collect employer contributions due under reciprocal agreements,[25] contravened the fiduciary obligations imposed by Section 404 of ERISA.[26] The plaintiffs also attacked IRS's review of the trustees' action, arguing that the agency ignored statutorily-mandated factors,[27] denied the intervention request in violation of their statutory and constitutional rights,[28] and approved the amendments without the support of substantial evidence.[29] Finally, the plaintiffs claimed that even aside from improprieties in trustee conduct or IRS deliberation, the benefit reduction failed to satisfy Section 302(c)(8)'s substantive requirements.[30]

On cross-motions for summary judgment, the District Court rejected these claims and refused to invalidate the challenged amendments. The court concluded that the trustees' adoption and approval of the amendments did not violate Section 404, citing a number of considerations—the broad discretion customarily accorded trustees in matters of fund administration, the trustees' evenhanded treatment of plan

beneficiaries, compliance with IRS procedures and requests, and seemingly good faith efforts to oversee payment of reciprocal contributions, preserve the financial viability of the plan, and submit accurate data to IRS.[31]

The court also rejected, on different grounds, the contention that the trustees' denials of Nichols' information requests breached the fiduciary duties imposed by Section 404.[32] Because ERISA subjects trustees of qualifying funds to several express disclosure requirements, none of which the plaintiffs claimed the trustees infringed, the court held that it would find a breach of fiduciary obligation for lack of disclosure only if the trustees had engaged in "egregious" conduct[33] or otherwise acted in a manner inconsistent with "fundamental fairness."[34] The trustees had granted access to the application materials in December, 1979, and Nichols acquired copies less than a month later. The plaintiffs' failure to demonstrate that more timely disclosure would have altered the

---

24. *Id.* ¶¶ 22–24, 43, R.Doc. 29 at 5, 7, A.App. 12, 14; see also Plaintiffs' Memorandum in Response to Defendant Board of Trustees' Motion for Summary Judgment, *supra* note 23, R.Doc. 76 at 4–5.

25. See Amended Complaint, *supra* note 2, ¶ 43, R.Doc. 29 at 7, A.App. 14.

26. Pub.L. No. 93–406, tit. I, 88 Stat. 829, 877 (1974) (codified at 29 U.S.C. § 1104 (1982)) [hereinafter cited as codified].

27. See Memorandum in Support of Plaintiffs' Motion for Summary Judgment Against Defendant IRS, *supra* note 2, R.Doc. 75 at 24–27.

28. See Amended Complaint, *supra* note 2, ¶ 45, R.Doc. 29 at 7, A.App. 14.

29. See *id.* ¶ 47, R.Doc. 29 at 8, A.App. 15. See also Memorandum in Support of Plaintiffs' Motion for Summary Judgment Against Defendant IRS, *supra* note 2, R.Doc. 75 at 11–29.

30. See Memorandum in Support of Plaintiffs' Motion for Summary Judgment Against Defendant IRS, *supra* note 2, R.Doc. 75 at 4–10.

31. See *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 6–11, A.App. 36–41. The court apparently accepted the plaintiffs' uncontradicted claim that the trustees had not collected roughly $22,000 in employer contributions to which the fund was entitled by reciprocal agree-

ments. *Id.*, R.Doc. 87 at 9, A.App. 39. The Supreme Court has recently emphasized that pension fund trustees have a fiduciary obligation promptly to collect monies owed to the fund. *Central States, SE & SW Areas Pension Fund v. Central Transp., Inc.,* 472 U.S. 559, 573, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447, 459 (1985). See also *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 286 (3d Cir.1983). Finding that the system which the trustees employed to collect these contributions was not irrational when first established, *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 10 n. 4, A.App. 40 n. 4, the court held that the trustees' failure in this regard did not constitute a breach of the fiduciary obligations imposed in § 404 of ERISA, *id.* The Court, however, fashioned prospective relief responsive to plaintiffs' claim, *id.*, holding that

> it is the duty of the Trustees [under § 404] to determine what is owed to the Plan in reciprocal contributions for the years in question, to attempt to collect this sum, and to create a system by which future reciprocal contributions may be monitored, recorded and credited with accuracy.

*Id.*, R.Doc. 87 at 10, A.App. 40.

32. *Id.*, R.Doc. 87 at 3–5, A.App. 33–35.

33. *Id.*, R.Doc. 87 at 4, A.App. 34.

34. *Id.*, R.Doc. 87 at 5, A.App. 35.

administrative outcome was deemed confirmation of the court's determination that the trustees' refusal of Nichols' presubmission requests was neither egregious nor fundamentally unfair.[35]

The District Court was similarly unresponsive to the plaintiffs' contention that the amendment exceeded Section 302(c)(8)'s bounds on retroactivity. The plaintiffs wielded a single statement in the legislative history to support their construction of Section 302(c)(8) as restricting the permissible retroactive effect of amendments to a two-year period; they argued that the plan amendments overstepped this limitation by retroactively reducing the retirement benefits to which they were entitled for all the years they had worked in covered employment, not only those after 1977.[36] The court dismissed this contention, accepting instead the agency's interpretation of Section 302(c)(8) as prohibiting only those amendments that, unlike the one disputed here, reduced benefits already accrued at the beginning of the first validly affected plan year.[37]

The plaintiffs' challenge to IRS's deliberative process fared no better. The court put aside, not their assertion that IRS did not consider all statutorily-enumerated factors, but their argument that ERISA required the agency to do so. It then dismissed the plaintiffs' claim, finding that "[t]he record in this case shows that the IRS considered a sufficient number of the pertinent factors in light of the evidence submitted by the Trustees ... and existing circumstances."[38]

Proceeding to the plaintiffs' final contention, the court held that the agency's refusal to allow Nichols to intervene did not taint the proceeding from which it excluded him.[39] Because Section 302(c)(8) contemplates action by IRS within ninety days after submission of a proposed retroactive amendment,[40] denial of Nichols' request to intervene was thought to promote substantially "the orderly conduct of public business" and thus survived scrutiny under Section 6(a) of the Administrative Procedure Act,[41] upon which the claim was grounded in part.[42] Congress' decision not to include in ERISA a proposed provision entitling interested persons to intervene in these proceedings was read as supportive of the court's conclusion.[43]

Finally, the court dismissed the alternative contention that IRS contravened the Fifth Amendments' Due Process Clause by denying Nichols' participation plea. Performing the constitutionally-required balancing test,[44] the court reasoned that the low risk of erroneous deprivation under present procedure, the slight likelihood that beneficiaries could contribute significantly to agency decisionmaking, the trustees' ethical and fiduciary obligations to at least consider beneficiaries' interests, and the administrative burden caused by intervention, rendered constitutional IRS's stream-

---

**35.** *Id.* The District Court bolstered its conclusion that the plaintiffs probably would not have benefited from earlier disclosure by referring to its subsequent determination that the plaintiffs possessed no right to intervene in the IRS deliberations on the amendments. *Id.* We reject that holding. See Part IV *infra.*

**36.** See Memorandum in Support of Plaintiffs' Motion for Summary Judgment Against Defendant IRS, *supra* note 2, R.Doc. 75 at 4–9.

**37.** *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 12–13, A.App. 42–43.

**38.** *Id.,* R.Doc. 87 at 14, A.App. 44 (citation omitted).

**39.** *Id.,* R.Doc. 87 at 15–18, A.App. 45–48.

**40.** The section provides that an unapproved amendment automatically takes effect ninety days after submission unless IRS repudiates it before the expiration of that period. 29 U.S.C. § 1082(c)(8) (1982). See Part III(A) *infra.*

**41.** Pub.L. No. 404, 60 Stat. 240 (1946), codified as amended at 5 U.S.C. § 555(b) (1982) [hereinafter cited as codified].

**42.** *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 15–16, A.App. 45–46.

**43.** *Id.,* R.Doc. 87 at 15, A.App. 45.

**44.** See, e.g., *Schweiker v. McClure,* 456 U.S. 188, 198, 102 S.Ct. 1665, 1671, 72 L.Ed.2d 1, 9–10 (1982); *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).

lined procedure.[45]

Thus the court rejected all of the plaintiffs' challenges to the retroactive plan amendments and therefore dismissed the case. The plaintiffs then sought review by this court.[46]

# III

■ At the outset, we are confronted by the question whether appellants timely served and filed a notice of appeal from the judgment they now seek to attack. Very shortly after the District Court dismissed their case, appellants tendered to the District Court a motion for reconsideration[47] which, under Federal Civil Rule 59(e), operated as a motion to alter or amend the judgment.[48] Appellants explicitly anchored their motion in Rule 59,[49] and the well-established doctrine is that regardless of the way a caption characterizes a motion, a post-judgment filing challenging the correctness of the judgment falls within Rule 59(e)'s perimeter.[50]

Undeniably, appellants' motion for reconsideration satisfied the time demands of the Civil Rules. Appellants met Rule 59(e)'s ten-day service requirement[51] by providing the prescribed notice on July 28, 1982,[52] nine days following entry of the judgment,[53] and the terms of Federal Civil Rule 5(d)[54] by filing the motion within a reasonable time after service—on August 2, 1982.[55] We conclude that the motion for reconsideration qualifies as a timely motion under Rule 59(e) to alter or amend the judgment from which this appeal emanates.

■ This determination directly affects the timeliness of appellants' notice of appeal. Federal Appellate Rule 4(a)(4) provides that filing of a timely motion under Civil Rule 59(e) tolls the period for appeal

---

**45.** *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 16–18, A.App. 46–48. The court also relied upon the availability of remedies under ERISA for unlawful deprivations of pension benefits. *Id.* at 18, A.App. 48.

**46.** Notice of Appeal, *Nichols v. Board of Trustees*, No. 80–0563 (D.D.C.) (filed Aug. 19, 1982), R.Doc. 91, A.App. 51.

**47.** Motion for Reconsideration, *Nichols v. Board of Trustees*, No. 80–0563 (D.D.C.) (filed Aug. 2, 1982), R.Doc. 89.

**48.** See Fed.R.Civ.P. 59(e).

**49.** Motion for Reconsideration, *supra* note 47.

**50.** See, e.g., *Dove v. Codesco*, 569 F.2d 807, 809 (4th Cir.1978); *Miller v. Leavenworth–Jefferson Elec. Coop.*, 653 F.2d 1378, 1380 (10th Cir.1981); 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶ 204.12[1] at 4–67 (2d ed. 1985). At least one court has held specifically that a motion for "reconsideration" of an adverse judgment qualifies under Rule 59(e). See *Carson v. American Savs. Life Ins. Co.*, 15 Fed.R.Serv.2d (Callaghan) 1326, 1326 (4th Cir.1972).

**51.** Rule 59(e) provides that a motion thereunder must be *served* within ten days after judgment. Fed.R.Civ.P. 59(e). Appellants' failure to *file* the motion within this period thus did not affect its timeliness under the rule. See, e.g., *Keohane v. Swarco, Inc.*, 320 F.2d 429, 430–432 (6th Cir. 1963); *Parks v. "Mr. Ford,"* 68 F.R.D. 305, 307 (E.D.Pa.1975), *rev'd on other grounds*, 556 F.2d 132 (3d Cir.1977); cf. *Sadowski v. Bombardier Ltd.*, 527 F.2d 1132, 1133–1134 (7th Cir.1975)

(applying this rule to 59(b) motion). The criterion for timely filing is contained in Fed.R. Civ.P. 5(d), and here has been met by appellants. See notes 55–56 *infra* and accompanying text.

**52.** The date of service was recited in the certificate of service attached to the motion for reconsideration, *supra* note 47, and confirmed by IRS, see Brief for Federal Appellees at 3 n. 2.

**53.** *Nichols v. Board of Trustees*, No. 80–0563 (D.D.C. July 19, 1982) (order) R.Doc. 88, A.App. 50.

**54.** Fed.R.Civ.P. 5(d) provides that
[a]ll papers after the complaint required to be served upon a party shall be filed with the court either before service or within a reasonable time thereafter....

**55.** Appellants filed the motion five days after serving it, a period within the range the caselaw considers a "reasonable" length of time under Fed.R.Civ.P. 5(d). See, e.g., *Claybrook Drilling Co. v. Divanco, Inc.*, 336 F.2d 697, 700 (10th Cir.1964) (4 days); *Parks v. "Mr. Ford," supra* note 51, 68 F.R.D. at 308 (10 days); *Strasser v. Fascination Candy Co.*, 7 F.R.D. 267, 268 (N.D. Ill.1945) (4 days). Mindful as well of the liberal construction customarily accorded this provision, see note 76 *infra;* 4A C. Wright & A. Miller, Federal Practice ¶ 1152 at 440–441 (2d ed. 1987), we hold that appellants filed the motion for reconsideration within the time limit imposed by Rule 5(d).

until the District Court rules on the motion,[56] and that a notice of appeal filed in the meantime "shall have no effect." [57] The Supreme Court has held that this command is immune from judicial waiver.[58] Appellants strayed from the narrow path prescribed by the rule when they filed a notice of appeal on August 18, 1982,[59] before the District Court denied the motion to reconsider on September 14.[60] Applying the rule's sanction for premature filing, we hold that the August 18, 1982, notice of appeal was ineffective.

This conclusion, however, does not necessarily require dismissal of the appeal. The premature filing eviscerated the notice of appeal involved, but did not foreclose appellants' ability to cure the deficiency by timely filing of a new notice of appeal after disposition of the motion to reconsider.[61] We find that the certificate appellants filed in this court pursuant to Federal Appellate Rule 10(b)(1),[62] which notified us that they would not order a transcript of the District Court proceedings for use on appeal,[63] constituted just such a curative instrument. And since appellants filed this certificate on September 22, 1982,[64] eight days after the District Court denied their motion for reconsideration,[65] it unquestionably satisfied, as the earlier notice of appeal clearly did not, Appellate Rule 4(a)'s requirement of filing within sixty days after the court's disposition of that motion.

The substantial issue then becomes whether the certificate contains the data Federal Appellate Rule 3(c) [66] necessitates for an efficacious notice of appeal. We hold that it does. Appellants' failure to label the certificate explicitly as a "notice of appeal" does not subvert its sufficiency under Rule 3(c); indeed, that rule unequivocally rejects that result by providing that "[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal." [67] Would-be appellants, the cases hold, need only serve and file a document evincing with reasonable clarity an intention to appeal.[68] Appellants' Rule 10(b)(1) certificate served on appellees [69] and filed

56. Fed.R.App.P. 4(a)(4) specifies that
[i]f a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party ... under Rule 59 to alter or amend the judgment ..., the time for appeal for all parties shall run from the entry of the order ... granting or denying ... such action.

57. *Id.*

58. *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225, 229–230 (1982).

59. See note 47 *supra.*

60. *Nichols v. Board of Trustees,* No. 80–0563 (D.D.C. Sept. 14, 1982) (order), R.Doc. 92.

61. Rule 4(a)(4) expressly affirms this option: it provides that when a notice of appeal is prematurely filed, "[a] new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion...." Fed.R.App.P. 4(a)(4).

62. See Fed.R.App.P. 10(b)(1).

63. See Certificate Under Rule 10(b)(1), Federal Rules of Appellate Procedure, *Nichols v. Board of Trustees,* No. 82–1959 (D.C.Cir.) (filed Sept. 22, 1982).

64. *Id.*

65. See note 47 *supra.*

66. Fed.R.App.P. 3(c).

67. *Id.*

68. E.g., *Interstate Natural Gas Ass'n v. FERC,* 244 U.S.App.D.C. 145, 149, 756 F.2d 166, 170, *cert. denied sub nom., Pennzoil Co. v. Associated Gas Distrib.,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985); *Pasternack v. Commissioner,* 155 U.S.App.D.C. 384, 389, 478 F.2d 588, 593 (1973); *Fitzsimmons v. Yeager,* 391 F.2d 849, 853 (3d Cir.), *cert. denied,* 393 U.S. 868, 89 S.Ct. 154, 21 L.Ed.2d 137 (1968); *Cobb v. Lewis,* 488 F.2d 41, 45 (5th Cir.1974); *Rabin v. Cohen,* 570 F.2d 864, 866 (9th Cir.1978). The Advisory Committee on Appellate Rules has expressly endorsed this principle:

In a number of decided cases it has been held that so long as the function of notice is met by the filing of a paper indicating an intention to appeal, the substance of the rule has been complied with.... [Rule 3(c)] give[s] recognition to this practice.

Fed.R.App.P. 3 advisory committee's note on 1979 amendment (citations omitted).

69. See Certificate of Service attached to Certificate Under Rule 10(b)(1), Federal Rules of Appellate Procedure, *supra* note 63.

in this court[70] recites the title and docket number of the case, and then asserts that

> [a]ppellants hereby certify that no transcript of proceedings below will be ordered. The decision from which this appeal is brought was rendered on cross-motions for summary judgment, with no proceedings transcribed.[71]

This certificate plainly reveals appellants' resolve to pursue an appeal from the District Court's order on the cross-motions for summary judgment, and therefore functions as a notice of appeal therefrom.

Even so, the adequacy of the certificate for jurisdictional purposes depends additionally upon satisfaction of Appellate Rule 3(c)'s requirement that it specify the parties taking the appeal, designate the judgment appealed from, and identify the court to which the appeal is taken.[72] The certificate easily fulfills the first and last of these prerequisites: it identifies the parties bringing the appeal and the court in which appellate review is sought. It also designates the judgment appealed from with enough specificity to meet Rule 3(c)'s second requirement, not only by supplying the case title and docket number but also by stating that the District Court rendered the decision appealed from on cross-motions for summary judgment. Since the District Court made only one of that kind, there can be no doubt about the judgment to which the certificate refers. Furthermore, courts generally excuse an inexact designation so long as the would-be appellant discloses a desire to appeal from a specific judgment and the indecisiveness does not prejudice opposing parties.[73] Appellants' Rule 10(b)(1) certificate plainly reveals their intention to appeal from a particular judgment, and appellees do not assert prejudice from the designation utilized.[74] We find that the Rule 10(b)(1) certificate possesses each of the prerequisites called for by Rule

---

**70.** Fed.R.App.P. 3(a) requires would-be appellants to file the notice of appeal with the clerk of the district court. When, however, parties contravene this directive, courts generally do not dismiss the appeal for procedural irregularity; instead, they react in spirit fostered by the Advisory Committee, see Fed.R.App.P. 3 advisory committee notes, by excusing the error absent prejudice to appellees. E.g., *Richey v. Wilkins,* 335 F.2d 1, 4 (2d Cir.1964); *Frace v. Russell,* 341 F.2d 901, 903 (3d Cir.), *cert. denied,* 382 U.S. 863, 86 S.Ct. 127, 15 L.Ed.2d 101 (1965); *Cobb v. Lewis, supra* note 68, 488 F.2d at 46. See generally 9 Moore's Federal Practice, *supra* note 50, ¶ 203.09 at 3–37–3–41. We do likewise here.

**71.** Certificate Under Rule 10(b)(1), Federal Rules of Appellate Procedure, *supra* note 63.

**72.** Fed.R.App.P. 3(c).

**73.** The rule is now well settled that a mistake in designating the judgment ... should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.

9 Moore's Federal Practice, *supra* note 50, ¶ 203.18 at 3–76 to 3–77 (footnote omitted); see also cases cited in *id.* at 3–76 n. 9.

**74.** We note that appellants' recitation of the fact of an appeal, the case title, the docket number, and the court of appellate review strongly implicates the original notice of appeal that likely spawned these references. Because this original notice clearly complied with Rule 3(c), though not Rule 4(a)(4), its implicit incorporation into appellants' Rule 10(b)(1) certificate provides additional ground for our determination that the certificate satisfied Rule 3(c).

This resort to the defective notice of appeal neither transgresses nor undermines the unequivocal proscription of Rule 4(a)(4). We read that rule as a command that a prematurely-filed notice of appeal is not viable, and not as a barrier to its recognition simply as a source of information serving opposing parties and the court alike.

Moreover, the harsh consequences of a contrary interpretation—that Rule 4(a)(4) prohibits judicial recognition of the deficient notice in all circumstances and for all purposes—fortifies our position. Suppose, for example, that upon learning that a premature filing had rendered a notice of appeal fatally defective, the affected litigant tenders a timely second document, explicitly labeled a notice of appeal, to remedy the earlier procedural irregularity. Suppose further that the would-be appellant attempted compliance with Rule 3(c) by explicitly referring to the defective notice rather than by transcribing the data in the old notice into the new notice. Surely in these circumstances Rule 4(a)(4)'s prescription that the prematurely-filed notice "shall have no effect" should not be construed as a mandate to dismiss the appeal solely because the party chose to incorporate the contents of the earlier notice by reference. The incorporation of the data contained in the invalid notice does not trigger Rule 4(a)(4)'s nullification directive, and the information incorporated enables the new notice to fulfill the requirements imposed by Rule 3(c).

3(c), and accordingly qualifies as a valid notice of appeal.

We therefore hold that while appellants' prematurely-filed notice of appeal must be discarded under Appellate Rule 4(a)(4), their Rule 10(b)(1) certificate operated as a valid notice of appeal under Rule 3,[75] cured the defect of the earlier notice, and preserved this appeal.

## IV

### A. *The Statutory Scheme.*

Section 204(g) of ERISA, as codified, states that "[t]he accrued benefit of a participant under a [qualifying] plan may not be decreased by an amendment of the plan, other than an amendment described in section [302(c)(8)]."[76] Section 302(c)(8),[77] in turn, establishes two independent sets of hurdles that a plan must clear before an amendment retroactively reducing accrued benefits may take effect. First, three substantive provisions govern the adoption, scope, and reasonableness of an amendment proposing a reduction, requiring that it

> (A) [be] adopted after the close of [the affected] plan year but no later than 2½ months after the close of the plan year (or, in the case of a multi-employer plan, no later than 2 years after the close of such plan year),

> (B) ... not reduce the accrued benefit of any participant determined as of the beginning of the first plan year to which the amendment applies, and

> (C) ... not reduce the accrued benefit of any participant determined as of the time of adoption except to the extent required by the circumstances....[78]

The section's use of the conjunction "and" makes clear that validity of the proposed amendment requires fulfillment of each of these prerequisites.[79]

---

**75.** Our analysis supporting this holding is strengthened by the position explicated by Justice Marshall in *Griggs v. Provident Consumer Discount Co., supra* note 58, 459 U.S. at 62–66, 103 S.Ct. at 404–406, 71 L.Ed.2d at 230–232 (dissenting opinion). As the Justice indicated, *id.* at 62 n. 1, 103 S.Ct. at 404 n. 1, 71 L.Ed.2d at 230 n. 1, the *Griggs* majority's decision that federal courts lack authority to waive Rule 4(a)(4)'s nullification of prematurely-filed notices of appeal does not purport to determine whether a timely subsequent document may operate as an effective notice of appeal removing the jurisdictional bar left standing by the earlier defective notice. Nor does our resolution of this issue transgress or subvert Rule 4(a)(4)'s command that an appellant's ultimately notice of appeal "shall have no effect." The primary motivation behind adoption of this proscription was a perceived need for assurance that in any case awaiting resolution of a timely Rule 59(e) motion, only the district court possesses jurisdiction to modify a judgment from which an appeal might ultimately be sought. *Griggs v. Provident Consumer Discount Co., supra* note 58, 459 U.S. at 58–60, 103 S.Ct. at 402–403, 74 L.Ed. 2d at 228–229. Our nullification of appellants' original notice of appeal fully accommodates both this legislative design and the rule's literal reach, and our concomitant holding that appellants' Rule 10(b)(1) certificate served as a valid notice of appeal does not encroach on the rule's demesne. See note 61 *supra* and accompanying text. Judicial extension of Rule 4(a)(4)'s preclusive effect to documents such as the certificate not only would diverge sharply from estimated doctrine favoring liberal construction of rules governing the sufficiency of notices of appeal, e.g., *United States v. Ramos,* 413 F.2d 743, 745 (1st Cir.1969); *Terkildsen v. Waters,* 481 F.2d 201, 206 (2d Cir.1973); *Gunther v. E.I. Du Pont De Nemours & Co.,* 255 F.2d 710, 717 (4th Cir. 1958); *Higginson v. United States,* 384 F.2d 504, 508 (6th Cir.1967), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968); *Martin v. Clarke,* 105 F.2d 685, 686 (7th Cir.1939); see also Fed.R.App.P. 3 advisory committee notes, but would contradict the accepted principle that courts should not pretermit decisions on the merits for merely technical defaults, e.g., *Foman v. Davis,* 371 U.S. 178, 181–182, 83 S.Ct. 227, 229–230, 9 L.Ed.2d 222, 225–226 (1962); *Perrington Wholesale v. Burger King Corp.,* 631 F.d 1369, 1379 (10th Cir.1980) (on rehearing).

**76.** Pub.L. No. 93–406, tit. I, § 204(g), 88 Stat. 829, 862 (1974) (codified at 29 U.S.C. § 1054(g) (1982)). The Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986) (codified in Titles 16, 19, 25, 26, 28, 29, 42, 46, and 49 of U.S.C.A. (1987)) changes slightly the operative language of § 204(g) to include amendments to terminated multi-employer plan pursuant to 29 U.S.C. § 1441 (1982).

**77.** 29 U.S.C. § 1082(c)(8) (1982).

**78.** *Id.*

**79.** While the word "and" may in rare circumstances be read as "or," see *DeSylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 976, 100 L.Ed. 1415, 1424 (1956), normally the two are not interchangable, and "and" is to be read in its conjunctive connotation. See *United States v.*

Second, Section 302(c)(8) erects an elaborate mandatory procedure for agency preclearance of the amendment. The plan administrator must file the measure with IRS, and the amendment becomes effective upon agency endorsement or, absent agency disapproval, after ninety days from its submission.[80] The section also supplies a standard to govern IRS review of the sought-after amendment:

[n]o amendment described in this subsection shall be approved by [IRS] unless [that agency] determines that such amendment is necessary because of a substantial business hardship (as determined under section 1083(b) of this title) and that waiver [of the minimum funding standard] is unavailable or inadequate.[81]

Moreover, Section 302(c)(8) expressly incorporates Section 303(b),[82] which enumerates four factors that must be considered during the inquiry into substantial business hardship:

[T]he factors taken into account in determining substantial business hardship shall include (but shall not be limited to) whether—

(1) the employer is operating at a economic loss,

(2) there is substantial unemployment or underemployment in the trade or business and in the industry concerned,

(3) the sales and profits of the industry concerned are depressed or declining, and

(4) it is reasonable to expect that the plan will be continued only if the waiver is granted.[83]

Validation of a retroactive amendment requires successful invocation of the pre-

---

*Moore,* 198 U.S.App.D.C. 296, 307, 613 F.2d 1029, 1040 (1979), and cases cited therein.

**80.** *United States v. Moore, supra* note 79, 198 U.S.App.D.C. at 307, 613 F.2d at 1040. Section 302(c)(8) does not state explicitly that IRS has authority to disapprove retroactive amendments, but this power accrues to IRS by plain implication from statutory language and history indicating that *an amendment is automatically* effectuated ninety days after submission occurs only if IRS has "failed to disapprove" the amendment. See *id.;* H.R.Rep. No. 1280, 93rd Cong., 2d Sess. 271 (1974), U.S.Code Cong. & Admin.News 1974, p. 4639, 5052. It seems equally clear that IRS retains power to disapprove amendments even after the ninety-day period has expired. The provision permitting enforcement of amendments upon expiration of *this period removes the potential for irreparable* harm to qualifying plans from delayed administrative approval of necessary plan amendments, but does not displace the agency's ultimate responsibility to determine the validity of retroactive measures governed by this section.

**81.** 29 U.S.C. § 1082(c)(8) (1982). Under the section as written, these criteria apparently govern only the agency's decision to approve, not one to disapprove, a proposed amendment. Nevertheless, these criteria can illumine judicial scrutiny of an IRS nullification of a measure submitted. See 5 U.S.C. § 706 (1982).

**82.** Pub.L. No. 93–406, tit. I, 88 Stat. 829, 872 (1974) (codified at *29 U.S.C.* § 1083(b) (1982)) [hereinafter cited as codified].

**83.** *Id.* Section 303(b)'s primary purpose is to instruct the agency's determination on whether to waive the minimum funding standard under § 303(a). Its transplantation into the retroactive amendment provisions of § 302(c)(8) cannot be accomplished as Congress intended without a quantum of judicial construction of the language of § 303. For example, the fourth factor enumerated, as written, speaks to the relationship between allowance of a "waiver" and the plan's survival. This provision makes sense in the § 302(c)(8) context only if we substitute for "waiver" the word "amendment." Indeed, Congress itself performed this lexical surgery when it paraphrased the factor to require IRS consideration of whether there exists "serious danger that the plan will be terminated unless the amendment is allowed." H.R.Rep. No. 1280, *supra* note 80, at 271, U.S.Code Cong. & Admin.News 1974, p. 5052; see also H.R.Rep. No. 807, 93rd Cong., 2d Sess. 59 (1974), U.S. Code Cong. & Admin.News 1974, p. 4639. Furthermore, the first factor established by § 303(b)—whether "the employer is operating at an economic loss," 29 U.S.C. § 1083(b)(1) (1982) —does not assist the agency's review of an amendment proposed for a multi-employer plan. Since the financial postures of many employers are relevant to the consideration of a multi-employer plan, this factor essentially reiterates the second and third provisions regarding trade conditions in the affected industry. The legislative history confirms the conclusion that Congress not only recognized generally that multi-employer plans involve considerations different from those pertaining to single-employer plans, e.g., H.R.Rep. No. 779, 93rd Cong., 2d Sess. 25 (1974), but, significantly, omitted the first factor listed in § 303 when it recited the factors IRS must assess in determining whether a multi-employer plan faces substantial business hardship, *id.* at 82.

clearance procedure, satisfaction of the substantive standard, and a finding that waiver of ERISA's minimum funding requirements[84] "would not solve the fund's problems."[85]

### B. *The Agency's Finding of "Substantial Business Hardship."*

Appellants' primary contention on appeal is that IRS did not consider the factors mandated in Section 303(b) in determining whether the Asbestos Workers Local 24 Pension Plan faced substantial business hardship.[86] Upon review of the record, we agree that IRS did not evaluate each of the factors enumerated in this section; rather, IRS articulated just one rationale for its finding of substantial business hardship.[87] Since the plan was confronted by both substantial unfunded liabilities and decreasing hours annually worked in covered employment, IRS feared that preservation of the

**84.** Pub.L. No. 93–406, tit. I, § 302, 88 Stat. 829, 869 (1974) (codified at 29 U.S.C. § 1082 (1982).

**85.** *Stewart v. National Shopmen Pension Fund,* 235 U.S.App.D.C. 122, 130 n. 19, 730 F.2d 1552, 1560 n. 19, *cert. denied,* 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984).

**86.** See Brief for Appellants at 16–25. Appellants also claim that the tendered amendment infringes § 302(c)(8)'s substantive restrictions by reducing the retirement benefit unit for all years covered employment rather than only for the two years immediately preceding adoption of the amendment. See *id.* at 8–11. They attempt to bolster their construction, not with the text of § 302(c)(8), but solely by referring to a single statement in the legislative history that tends generally to imply that retroactive measures may not reach back beyond two years. H.R.Rep. No. 1280, *supra* note 80, at 271, U.S. Code Cong. & Admin.News 1974, p. 4639. We reject this claim. We note initially that the Committee statement upon which appellants rely may reasonably be interpreted in congruence with § 302(c)(8)(A) and (B), which establishes only that the amendment may not reduce benefits already accrued as of the beginning of the plan year in progress two years prior to the adoption of the amendment. The trustees clearly have complied with this directive. Furthermore, that section employs specific language detailed to delineate this requirement. Appellants' construction, which would add another level of stringency, is at odds with this near-formulaic tone. See *Stewart v. National Shopmen Pension Fund, supra* note 85, 235 U.S.App.D.C. at 131, 730 F.2d at 1561 ("the best guide to what a statute *means* is what it *says*;" had Congress intended plaintiffs' construction of ERISA, "it could easily have said so"). In light of the doctrine precluding departure from the plain meaning of statutory terms absent clear and persuasive evidence of legislative intent, e.g., *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246, 252 (1981); *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744, 749 n. 3 (1981); *Albernaz v. United States,* 450 U.S. 333, 336, 101 S.Ct. 1137, 1141, 67 L.Ed. 2d 275, 280 (1981); *Consumer Prod. Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766, 772 (1980), we decline appellants' insufficiently supported invitation to reshape the contours of these subsections. Our duty to construe statutes, when possible, without rendering any term nugatory or ineffective, but rather by according reasonable meaning to each part, e.g., *United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 520, 99 L.Ed. 615, 624 (1955); *United States v. Powers,* 307 U.S. 214, 217, 59 S.Ct. 805, 807, 83 L.Ed. 1245, 1249 (1939); *D. Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704, 708 (1932); *Bird v. United States,* 187 U.S. 118, 124, 23 S.Ct. 42, 44, 47 L.Ed. 100, 103 (1902); *Montclair v. Ramsdell,* 107 U.S. (17 Otto) 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431, 433 (1883); *Market Co. v. Hoffman,* 101 U.S. (11 Otto) 112, 115, 25 L.Ed. 782, 783 (1879), also demands disapproval of appellants' statutory interpretation. See also *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893, 907 (1937) (specific statutory provisions overcome inferences to contrary from general, ambiguous legislative declarations); *Pennsylvania R.R. Co. v. International Coal Mining Co.,* 230 U.S. 184, 198–199 & n. 1, 33 S.Ct. 893, 896–897 & n. 1, 57 L.Ed. 1446, 1452 & n. 1 (1913) (specific statutory provisions prevail over single contrary statement in legislative debate). Finally, we note that IRS has vigorously pressed the contrary interpretation, see e.g., Brief for Federal Appellees at 23–27, and we accord due deference to the agency's expertise. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694, 702–703 (1984); *Rettig v. Pension Benefit Guar. Corp.,* 240 U.S.App.D.C. 118, 125, 744 F.2d 133, 140–141 (1984).

**87.** See Internal Revenue Service's Affidavit Statement of Reasons for Decision Approving Retroactive Amendment Submitted by Board of Trustees, *Nichols v. Board of Trustees,* No. 80–0563 (D.D.C.) (filed Feb. 1, 1982), R.Doc. 82 at 2–5; see also Brief for Federal Appellees at 27–33. This statement was elicited by an order of the District Court requiring IRS to elucidate its rationale for approving the amendment. See Submission of Defendant Internal Revenue Service in Response to Court's Order of January 12, 1982, *Nichols v. Board of Trustees,* No. 80–0563 (D.D.C.) (filed Feb. 1, 1982), R.Doc. 82. The order referred to appears at R.Doc. 81.

plan's financial stability by an elevation of the contribution level would ignite an "increasing assessment spiral" wreaking precisely the opposite effect.[88] In this scenario, an incremental hike in the contribution rate inuring primarily to the benefit of retired participants rather than present employees could cause some participating employers to leave the plan in favor of one less tilted against current recipients.[89] This, in turn, could further erode the plan's funding base, and launch the plan upon a self-fueling spiral of rising contribution levels and mounting employer defections that ultimately would cause its collapse.[90] Concerned that a higher contribution level for participating employers conceivably might trigger such a destructive course, IRS concluded that there was substantial business hardship justifying approval of an alternate solution—the proposed retroactive reduction in benefits.[91]

The agency's deliberations on the specter of an assessment spiral, though undeniably germane to the inquiry into substantial business hardship,[92] obviously did not constitute a survey of the factors enumerated by Section 303(b). The record contains no evidence revealing meaningful agency consideration of several questions specified in Section 303(b): industry sales, profits, and employment patterns; the economic positions of participating employers; or the likelihood that the plan would in fact fail absent the proposed amendment.[93] IRS does not claim that it explored these elements: indeed, its lack of relevant information largely foreclosed any effort of that sort.[94] As a matter of practice, IRS primarily confines its statutorily-required deliberations to materials initially submitted by plan administrators with approval applications.[95] The agency's glaring inattention to vital Section 303(b) factors directly correlates to the failure of the plan trustees to supply the data necessary for their appraisal by IRS. The informational deficiencies and our review of the record render inescapable the conclusion that IRS did not evaluate all factors specified by Section 303(b).

■ The District Court did not disagree with this conclusion, but nevertheless dismissed appellants' claim on the ground that the agency considered a "sufficient number" of Section 303(b)'s elements in light of

---

**88.** Internal Revenue Service's Affidavit Statement of Reasons for Decision Approving Retroactive Amendment Submitted by Board of Trustees, *supra* note 87, R.Doc. 82 at 3.

**89.** *Id.* at 2–3.

**90.** *Id.* at 3.

**91.** *Id.* at 5.

**92.** 29 U.S.C. § 1083(b)(2), (4) (1982).

**93.** That the agency's consideration entailed a recognition that the "increasing assessment spiral" might topple the plan did not, without more, satisfy § 303(b)(4), 29 U.S.C. § 1083(b)(4) (1982). The bare possibility of plan failure is insufficient; IRS must specifically determine whether the plan is reasonably expected to fail without the amendment proposed.

**94.** IRS obtained information on the financial positions of only four of thirteen significant contributing employers, see, e.g., Technical Case History Prepared by Kenneth Yednock at 7, Exhibit B in Appendix to Plaintiffs' Motion for Summary Judgment Against Defendant IRS, *supra* note 2, R.Doc. 75, and possessed virtually no data bearing upon industry-wide conditions, see, e.g., Deposition of Kenneth Yednock (May

4, 1981) at 51–52, R.Doc. 72. IRS does not suffer from lack of means to obtain pertinent materials. Not only did Congress recognize that "within the 90–day period [IRS] needs more information or more time before making a final determination," H.R.Rep. No. 1280, *supra* note 80, at 287, U.S.Code Cong. & Admin.News 1974, p. 4639, but IRS has adopted a regulation explicitly embracing this course of action, Rev.Proc. 79–18, § 7, 1979–1 C.B. 525, 527. Although IRS need not meticulously compile exhaustive case dossiers, it must at minimum attempt to acquire sufficient information to enable meaningful consideration of the statutory-listed factors. We contemplate that IRS will make such an effort on remand of this case, see text at notes 100–103 *infra,* and accordingly decline to reach appellants' claims that the agency's decision lacks substantial support in the record, see Brief for Appellants at 16–25, and that the retroactive amendment contravenes § 302(c)(8)(C), 29 U.S.C. § 1082(c)(8)(C) (1982), see Brief for Appellants at 11–16, absent the light a fuller record undoubtedly will cast upon their resolution.

**95.** See Internal Revenue Service's Affidavit Statement of Reasons for Decision Approving Retroactive Amendment Submitted by Board of Trustees, *supra* note 87, at 1, R.Doc. 82.

the evidence submitted and the circumstances.[96] Implicitly, the District Court construed Section 303(b) as not requiring agency appraisal of each of its elements. We cannot accept this proposition. The section states emphatically that "the factors taken into account in determining substantial business hardship *shall* include (but shall not be limited to)" the four listed components.[97] This peremptory language will not tolerate an interpretation that accords IRS discretion to select which of the identified factors, if any, to consider in assessing substantial business hardship. We do not disagree with the District Court's endorsement[98] of statements culled from the legislative history that not all specified elements need be met,[99] but it does not follow that IRS may avoid its plain statutory duty at least to *consider* each factor.

As we find that IRS neglected to assay the Section 303(b)–mandated points, we conclude that the challenged agency decision cannot stand.[100] IRS plainly failed to discharge its duty to reach an "express and

**96.** *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 14, A.App. 44.

**97.** 29 U.S.C. § 1083(b) (1982) (emphasis added). Under this section and § 302(c)(8), consideration of the four catalogued factors is required both for the determination that substantial business hardship exists, as well as for the determination that less drastic measures, such as a waiver under § 303(a), will not suffice.

**98.** *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 14, A.App. 44.

**99.** E.g., H.R.Rep. No. 807, *supra* note 83, at 82, U.S.Code cong. & Admin.News 1974, p. 4639.

**100.** Beside vacating the agency's approval of the amendment, we specifically disapprove the District Court's construction of § 404, 29 U.S.C. § 1104 (1982), as prohibiting nondisclosure by a fiduciary only in "egregious" circumstances or when violative of "fundamental fairness" absent a specific statutory demand to the contrary. *Nichols v. Board of Trustees, supra* note 3, R.Doc. 87 at 4, 5, A.App. 34, 35. The legislative history of § 404 reveals a clear congressional intent to impose obligations on fund trustees under ERISA that parallel the responsibilities that the common law of trusts applies to fiduciaries. *See* S.Rep. No. 127, 93rd Cong., 1st Sess. 29 (1973), U.S.Code Cong. & Admin.News 1974, p. 4639; 120 Cong.Rec. 29932 (1974) (remarks of Senator Williams); *see also* H.R.Rep. No. 1280, *supra* note 80, at 294, 298, U.S.Code Cong. & Admin.News 1974, p. 4639 (stating that ERISA requires plan assets to be held in "trust"); *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 151–152, 105 S.Ct. 3085, 3096, 87 L.Ed.2d 96, 109–110 (1985) (concurring opinion); *Central States SE & SW Areas Pension Fund v. Central Transp., Inc., supra* note 31, 472 U.S. at 568–572, 105 S.Ct. at 2839–2841, 86 L.Ed. 2d at 456–458; *Fink v. National Sav. & Trust Co.,* 249 U.S.App.D.C. 33, 37, 772 F.2d 951, 955 (1985); *Palino v. Casey,* 664 F.2d 854, 857 (1st Cir.1981); *Eaves v. Penn,* 587 F.2d 453, 457, 462–463 (10th Cir.1978); *Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986, 990 (E.D.N.Y.1978). Consistently with this legislative purpose, courts measure the conduct of trustees of qualifying funds by the arbitrariness standard applicable at common law. *See Palino v. Casey, supra,* 664 F.2d at 858; *Building Trades Employers Ass'n v. New York State Teamsters Conference Pension & Retirement Fund,* 761 F.2d 115, 117 (2d Cir.1985); *Berry v. Ciba-Geigy Corp.,* 761 F.2d 1003, 1006 (4th Cir.1985); *Quinn v. Burlington N. Inc. Pension Plan,* 664 F.2d 675, 678 (8th Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982); *Fentron Indus. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1307 (9th Cir.1982); *Donovan v. Carlough,* 576 F.Supp. 245, 248–249 (D.D.C.1983). Cognizant of the liberal construction customarily accorded remedial statutory provisions in general, e.g., *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 703, 88 L.Ed. 949, 956 (1944) (Fair Labor Standards Act), and this Act in particular, e.g., *Rettig v. Pension Benefit Guar. Corp., supra* note 86, 240 U.S.App.D.C. at 140, 744 F.2d at 155; *Sly v. P.R. Mallory & Co.,* 712 F.2d 1209, 1211 (7th Cir.1983); *Donovan v. Daugherty,* 550 F.Supp. 390, 403 (S.D.Ala.1982), we cannot accept the District Court's holding that ERISA's specific disclosure requirements implicitly replace the entrenched disclosure standard with a significantly more confined test nowhere articulated in the statute's text or legislative history. In our view, the disclosure provisions and the common-law arbitrariness test provide complementary, not competing, standards. Under these standards, appellants' § 404 claim against the Board for inadequate disclosure posed a substantial question of breach of fiduciary duty, especially since the trustees' actions in response to Nichols' informational requests, see text *supra* at notes 13–19, seemed almost calculated to deprive Nichols and other plan beneficiaries of any opportunity to participate meaningfully in § 302(c)(8) proceedings before expiration of the ninety-day period. However, because our remand ensures that plan beneficiaries will gain a renewed opportunity to participate in the agency's deliberations upon the amendment, further consideration of the claim is not warranted.

considered conclusion"[101] with respect to each listed question. We therefore vacate the agency's approval of the proposed amendment[102] and remand the case to District Court for further proceedings.[103]

## V

We come, finally, to the claim that IRS impermissibly denied appellant Nichols' petition to intervene in the proceedings to review the amendment. Appellants ground this contention upon Section 6(a) of the Administrative Procedure Act, as amended, which provides:

[s]o far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.[104]

Because IRS does not dispute that its Section 302(c)(8) review of proposed amendments falls generally within the purview of this clause,[105] the validity of appellants' claim rests solely upon the determination

---

**101.** See *Central Vermont Ry. v. ICC*, 229 U.S. App.D.C. 53, 58, 711 F.2d 331, 336 (1983); *Small Refiner Lead Phase-Down Task Force v. EPA*, 227 U.S.App.D.C. 201, 211, 705 F.2d 506, 516 (1983); *Weyerhaeuser Co. v. Costle*, 191 U.S.App. D.C. 309, 343, 590 F.2d 1011, 1045 (1978). The section does not, of course, require that the agency's deliberations accord any particular degree of weight to each factor.

**102.** IRS contends that appellants' challenge to its action approving the amendment does not present us with a case or controversy, a jurisdictional prerequisite under Article III of the Constitution, because the injury complained of stems from the trustees' adoption of the amendment, rather than from the agency's discharge of its statutory obligations. See Brief for Federal Appellees at 21–23; see also *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66, 76 (1979); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450, 462 (1976). IRS observes that even had it not acted upon the trustees' application, the amendment automatically would have become effective by operation of the statute ninety days after submission, causing precisely the same decrease in retirement benefits. Brief for Federal Appellees at 22. We do not agree, however, that we lack subject-matter jurisdiction over appellants' claim against IRS. This case involves neither agency-approved private action that did not harm complainants, see *Northwestern Pub. Serv. Co. v. FPC*, 172 U.S.App.D.C. 54, 59, 520 F.2d 454, 459 (1975), nor private action that does not require submission to the challenged federal agency, and therefore withstands its disapproval, see *Association of Inv. Brokers v. SEC*, 219 U.S.App.D.C. 259, 264, 676 F.2d 857, 862 (1982). Because the amendment could not be enforced absent submission to IRS and its explicit or de facto approval, appellants' injury cannot reasonably be construed as springing solely from the actions of the trustees. Moreover, IRS's argument would allow it in every case to ignore the statute's clear command to investigate the enumerated factors, merely because Congress has recognized that in some

instances the agency may not have sufficient resources to consider fully each individual claim within the allotted period. A contrary holding would render the detailed provisions of § 302(c)(8) entirely precatory by removing the agency's deliberations from judicial scrutiny. Finally, IRS does not deny that successful maintenance of appellants' claim requires further proceedings that could result in agency disapproval and invalidation of the challenged amendment. In light of these considerations, we entertain no doubt that this appeal embodies a justiciable case or controversy. Appellants' cause is "definite and concrete, touching the legal relations of parties having adverse legal interests," *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617, 621 (1937), and appellants "have the personal stake and interest that impart the concrete adverseness required by Article III," *Barlow v. Collins*, 397 U.S. 159, 164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192, 198 (1970).

We note that the Supreme Court's recent decision in *Massachusetts Mut. Life Ins. Co. v. Russell, supra* note 100, 473 U.S. at 147, 105 S.Ct. at 3093, 87 L.Ed.2d at 106, which denied recovery of extra-contractual damages under ERISA on the ground that the Court was "reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA," *id.*, in no way affects our determination that appellants present a justiciable case or controversy. Unlike the claim in *Massachusetts Mut. Life Ins. Co.*, the present claim is clearly contemplated by ERISA. 29 U.S.C. § 1132(a)(3) (1982).

**103.** Because the ninety-day period has elapsed and IRS has not announced disapproval of the amendment, the trustees may continue its enforcement pending conclusion of further proceedings before IRS. 29 U.S.C. § 1082(c)(8) (1982).

**104.** 5 U.S.C. § 555(b) (1982).

**105.** IRS does contend, however, that the District Court correctly found § 6(a) preempted by ERISA. See *Nichols v. Board of Trustees, supra*

whether a plan beneficiary such as Nichols qualifies as an "interested person" and whether intervention would harm "the orderly conduct of public business." We shall address each in turn.

■ Beneficiaries in a plan qualifying under ERISA unquestionably possess an "interest" in agency deliberations that might reduce their retirement benefits. ERISA Section 502(a)(3)(A) authorizes plan beneficiaries to maintain civil actions to enjoin any injurious act or practice that violates ERISA Subchapter I or the terms of the plan.[106] Because a party entitled to judicial review of agency action clearly qualifies as an "interested person" who normally may intervene in the administrative proceeding,[107] we hold that Nichols possessed such status under Section 6(a) when he requested permission to participate in the proceedings under review.[108]

note 3, R.Doc. 87 at 15–16, A.App. 45–46; Brief for Federal Appellees at 33–38. The District Court rested its holding upon legislative history disclosing that the version of ERISA ultimately adopted by Congress did not include an earlier draft provision which would have granted interested persons an opportunity to be heard prior to agency approval of retroactive amendments. However, this legislative deletion does not, in our opinion, displace an otherwise applicable provision of the Administrative Procedure Act. This action, for which Congress offered no explanation, might as easily have stemmed from a congressional intent to eliminate a redundant procedural requirement already covered by extant law, as from a desire to prohibit participation by interested persons. Further, § 12 of the Administrative Procedure Act, 5 U.S.C. § 559 (1982), unequivocally states, as amended, that a "[s]ubsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so expressly." In light of the uncertain import of the legislative history relied on by the District Court and the lack of any ERISA provision denying or even relating to public participation, we conclude that the rigorous standard set forth in § 12 has not been met. Cf. National Welfare Rights Org. v. Finch, 139 U.S.App.D.C. 46, 52–54, 429 F.2d 725, 731–733 (1970) (absence of statutory grant of standing to intervene in administrative proceeding does not preclude intervention). For these reasons, then, we reject the agency's contention that ERISA nullifies § 6(a)'s applicability to § 302(c)(8) proceedings. Massachusetts Mut. Life Ins. Co. v. Russell, supra note 100, 473 U.S. at 147, 105 S.Ct. at 3093, 87 L.Ed.2d at 106 is inapposite: appellants here seek no implied right under ERISA, but rather derive this claim from the APA.

106. Pub.L. No. 93–406, tit. I, 88 Stat. 829, 891 (1974) (codified at 29 U.S.C. § 1132(a)(3)(A) (1982)).

107. See Koniag, Inc. v. Andrus, 188 U.S.App.D.C. 338, 343, 580 F.2d 601, 606, cert. denied, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978); id. at 350, 580 F.2d at 613 (concurring opinion); Martin–Trigona v. Federal Reserve Bd., 166 U.S. App.D.C. 30, 33 n. 12, 509 F.2d 363, 366 n. 12 (1975); Seaboard & W. Airlines v. CAB, 86 U.S. App.D.C. 64, 67, 181 F.2d 515, 518 (1949), cert. denied, 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372 (1950); American Communications Ass'n v. United States, 298 F.2d 648, 650–651 (2d Cir. 1962); Fort Pierce Utils. Auth. v. Department of Energy, 503 F.Supp. 1014, 1018 (D.D.C.1980). This rule stems in part from judicial recognition that intervention in administrative proceedings often greatly facilitates meaningful judicial review. E.g., Koniag, Inc. v. Andrus, supra, 188 U.S.App.D.C. at 343, 580 F.2d at 606; National Welfare Rights Org. v. Finch, supra note 105, 139 U.S.App.D.C. at 57–58, 429 F.2d at 736–737; American Communications Ass'n v. United States, supra, 298 F.2d at 650; see also Sykes v. Jenny Wren Co., 64 App.D.C. 379, 385, 78 F.2d 729, 735, cert. denied, 296 U.S. 624, 56 S.Ct. 147, 80 L.Ed. 443 (1935) (dissenting opinion); First Nat'l Bank v. Saxon, 352 F.2d 267, 273–274 (4th Cir.1965), aff'd sub nom. First Nat'l Bank v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1967) (dissenting opinion). This concern applies with particular force to the instant case; record deficiencies potentially curable, at least in part, by contributions from intervenors have hampered appellants' challenge to the agency's approval of the submitted amendment.

108. We emphasize that parties may validly participate in agency proceedings even absent standing to obtain judicial review. See, e.g., Pittsburgh & W. Va. Ry. v. United States, 281 U.S. 479, 486, 50 S.Ct. 378, 381, 74 L.Ed. 980, 983 (1930); Alexander Sprunt & Son v. United States, 281 U.S. 249, 254–255, 50 S.Ct. 315, 317, 74 L.Ed. 832, 837 (1930); Gardner v. FCC, 174 U.S.App.D.C. 234, 238, 530 F.2d 1086, 1090 (1976); Ecee, Inc. v. FERC, 645 F.2d 339, 349 (5th Cir.1981); National Motor Freight Traffic Ass'n v. United States, 205 F.Supp. 592, 593 (D.D.C.), aff'd, 371 U.S. 223, 83 S.Ct. 311, 9 L.Ed.2d 273 (1962). Standing to intervene as of right is not restricted to parties entitled to judicial review. See Koniag, Inc. v. Andrus, supra note 107, 188 U.S.App.D.C. at 343, 580 F.2d at 606; National Welfare Rights Org. v. Finch, supra note 105, 139 U.S.App.D.C. at 53 n. 27, 429 F.2d at 732 n. 27. We acknowledge, however, that application of the "interested person" concept to parties not entitled to judicial review resists precise legislative or judicial delineation, American Trucking Ass'ns v. United States, 201 U.S.App.D.C. 327, 333–334, 627 F.2d 1313, 1319–

Despite qualifying as an "interested person," Nichols had a right to intervene only if his participation in the administrative process dovetailed with "the orderly conduct of public business." [109] Courts have long accorded agencies broad discretion in fashioning rules to govern public participation [110] and have for the most part permitted denials of requests for leave to intervene when, for example, other parties to the proceeding adequately represent the would-be intervenor's viewpoint [111] or intervention would broaden unduly the issues considered, [112] obstruct or overburden the proceedings, [113] or fail to assist the agency's decisionmaking. [114] As a general rule, however, courts will not rubberstamp a challenged denial based merely upon an assertion of justification, especially if the agency contends simply that intervention would prove impermissibly dilatory or burdensome. Courts willingly overturn challenged denials when the responsible agency, either by failing to fashion equitable procedures or by employing its power in an unreasonably overbroad or otherwise arbitrary manner, has not acted to preserve the participation opportunities of interested persons. [115]

Here, IRS interpreted its regulations governing submission of Section 302(c)(8) applications as prohibiting intervention even by interested persons, [116] and purportedly denied Nichols' participation request

---

1320 (1980), and requires close scrutiny, in the context of the statutory and regulatory schemes governing the proceedings in which intervention is sought, of the private interest asserted, see *Koniag, Inc. v. Andrus, supra* note 107, 188 U.S.App.D.C. at 343, 580 F.2d at 606; *Office of Communication of United Church of Christ v. FCC,* 123 U.S.App.D.C. 328, 334–336, 359 F.2d 994, 1000–1002 (1966).

**109.** 5 U.S.C. § 555(b) (1982); see also *Easton Utils. Comm'n v. Atomic Energy Comm'n,* 137 U.S.App.D.C. 359, 364, 424 F.2d 847, 852 (1970); *City of San Antonio v. CAB,* 126 U.S.App.D.C. 112, 117, 374 F.2d 326, 331 (1967).

**110.** *American Trucking Ass'ns v. United States, supra* note 108, 201 U.S.App.D.C. at 335, 627 F.2d at 1321; *BPI v. Atomic Energy Comm'n,* 163 U.S.App.D.C. 422, 425, 502 F.2d 424, 427 (1974); *Cities of Statesville v. Atomic Energy Comm'n,* 142 U.S.App.D.C. 272, 287, 441 F.2d 962, 977 (1969) (*en banc*); *City of San Antonio v. CAB, supra* note 109, 126 U.S.App.D.C. at 115, 118, 374 F.2d at 329, 332; *Telephone Users Ass'n v. FCC,* 126 U.S.App.D.C. 178, 178, 375 F.2d 923, 923 (1967); *Office of Communication of United Church of Christ v. FCC, supra* note 108, 123 U.S.App.D.C. at 339–340, 359 F.2d at 1005–1006; *Scenic Hudson Preservation Conference v. FPC,* 354 F.2d 608, 617 (2d Cir.1965), *cert. denied,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); *Alston Coal Co. v. FPC,* 137 F.2d 740, 742 (10th Cir.1943).

**111.** See *Cities of Statesville v. Atomic Energy Comm'n, supra* note 110, 142 U.S.App.D.C. at 287, 441 F.2d at 977; *City of San Antonio v. CAB, supra* note 109, 126 U.S.App.D.C. at 118, 119, 374 F.2d at 332, 333; *Scenic Hudson Preservation Conference v. FPC, supra* note 110, 354 F.2d at 617.

**112.** *Eastern Air Lines v. CAB,* 101 U.S.App.D.C. 156, 159, 247 F.2d 562, 565 (1957); 1 K. Davis,

Administrative Law Treatise § 8.11 at 564 (1958).

**113.** See *National Welfare Rights Org. v. Finch, supra* note 105, 139 U.S.App.D.C. at 59, 429 F.2d at 738; *City of San Antonio v. CAB, supra* note 109, 126 U.S.App.D.C. at 117, 374 F.2d at 332; *Office of Communication of United Church of Christ v. FCC, supra* note 108, 123 U.S.App.D.C. at 340, 359 F.2d at 1006.

**114.** See generally *Cities of Statesville v. Atomic Energy Comm'n, supra* note 110, 142 U.S.App. D.C. at 287, 441 F.2d at 977; *City of San Antonio v. CAB, supra* note 109, 126 U.S.App.D.C. at 118, 374 F.2d at 332; *Office of Communication of United Church of Christ v. FCC, supra* note 108, 123 U.S.App.D.C. at 339–340, 359 F.2d at 1005–1006; *Coastal Bend Television Co. v. FCC,* 98 U.S.App.D.C. 251, 255, 234 F.2d 686, 690 (1956) (*en banc*).

**115.** See *National Welfare Rights Org. v. Finch, supra* note 105, 139 U.S.App.D.C. at 59–60, 429 F.2d at 738–739; *Office of Communication of United Church of Christ v. FCC, supra* note 108, 123 U.S.App.D.C. at 339–340, 359 F.2d at 1005–1006; *Virginia Petroleum Jobbers Ass'n v. FPC,* 105 U.S.App.D.C. 172, 175 n. 1, 265 F.2d 364, 367 n. 1 (1959); *Scenic Hudson Preservation Conference v. FPC, supra* note 110, 354 F.2d at 617; *American Communications Ass'n v. United States, supra* note 107, 298 F.2d at 651. Furthermore, the agency's authority to shape the manner in which intervenors will participate in § 302(c)(8) proceedings provides ample protection against the potential release of confidential materials that troubles IRS, see Brief for Federal Appellees at 35 n. 10.

**116.** See Deposition of Kenneth Yednock, *supra* note 90, R.Doc. 72 at 68. IRS inferred this position from its regulations' failure to address the subject of public participation. See Rev. Proc. 79–18, *supra* note 94, at 525–527.

on this ground. In support of this flat rule, IRS argues that the section's ninety-day period for agency review of retroactive amendments does not permit the consumption of time resulting from intervention.[117] We cannot accept this position. IRS here faced an intervention plea from a single plan beneficiary who sought neither party status nor trial-type hearings and privileges, but only permission to "comment" on the trustees' application.[118] In these circumstances, we see no basis for apprehension that granting the participation request would unduly prolong the deliberations. Indeed, not only might appellants' intervention have enhanced the soundness of IRS decisionmaking through alleviating the agency's informational deficit, but their substantial pecuniary interests in completion of the proceedings before the advent of the ninety-day automatic approval would have ensured expeditious action. Thus, we can discern no reason to believe that granting Nichols' request would have interfered with the agency's discharge of its statutory obligations within the Section 302(c)(8) time period.

Furthermore, IRS has substantially overstated the inflexibility of the ninety-day period. As the agency's own rules contemplate and the legislative history confirms,[119] IRS may defuse the automatic-effectuation rule, thereby gaining additional time to collect data or to deliberate upon the application, by announcing its tentative disapproval of the proposed measure before the period lapses. Indeed, IRS has the power to disapprove a retroactive amendment under Section 302(c)(8) even after passage of the ninety-day interval renders the measure effective by operation of the statute.[120] That the ninety-day deadline neither precludes timely announcement of tentative disapproval nor limits administrative review of the proposed amendment further undermines the agency's claim that the statutory scheme forecloses intervention.

To be sure, intervention by substantial numbers of plan beneficiaries could conceivably swamp the agency's Section 302(c)(8) review process. However, we traditionally resist acceptance at face value of undifferentiated claims of prospective immersion under multiple intervention petitions,[121] especially when, as here, the cost of participation is likely to deter many potential applicants.[122] We adhere to that practice in this case. IRS retains untapped authority to ensure orderly procedure by promulgating rules limiting both the number of intervenors and the nature of their participation. The agency may not avoid its obligation to wield this power responsibly by implementing a flat ban upon all intervention—a ban for which IRS has adduced no reasonable justification.

Therefore, we hold that "the orderly conduct of public business" does not interpose a bar to Nichols' participation request and consequently does not justify denial of that request by the agency.[123] Because Nich-

---

117. See Brief for Federal Appellees at 33.

118. See Letter from James Klimaski to Winfield Burley, *supra* note 16.

119. See note 94 *supra*.

120. See note 80 *supra*.

121. See cases cited in note 115 *supra*. Both the Supreme Court and this court have recently acknowledged the enormous administrative burdens that ERISA imposes on the government. *Central States, SE & SW Areas Pension Fund v. Central Transp., Inc., supra* note 31, 472 U.S. at 578, 105 S.Ct. at 2844, 85 L.Ed.2d at 460–461; *Fink v. National Sav. & Trust Co., supra* note 100, 249 U.S.App.D.C. at 40, 772 F.2d at 958. However, this burden alone cannot justify denial of intervention.

122. See *National Welfare Rights Org. v. Finch, supra* note 105, 139 U.S.App.D.C. at 60, 429 F.2d at 739; *Office of Communication of United Church of Christ v. FCC, supra* note 108, 123 U.S.App.D.C. at 340, 359 F.2d at 1006; *Scenic Hudson Preservation Conference v. FPC, supra* note 110, 354 F.2d at 617.

123. IRS contends, nevertheless, that appellants' ERISA-derived right to judicial review of the trustees' actions constitutes a satisfactory substitute for participation in § 302(c)(8) proceedings. See Brief for Federal Appellees at 36. We disagree. Appellants' right under § 404, 29 U.S. C. § 1104 (1982), to challenge the Board's conduct as arbitrary hardly equates to the opportunity, through intervention at the administrative stage, to defeat an amendment by prompting agency disapproval under § 302(c)(8)'s detailed statutory scheme.

ols' status as an interested person entitled him to intervene in the agency's proceedings to review the amendment, neither the denial of his participation request nor the regulatory interpretation that purportedly supported that denial can stand. Although we decline to speculate under what standards the agency might grant or deny petitions for leave to intervene lodged by plan beneficiaries or others in the proceedings upon remand,[124] we note that compliance with Section 6(a)'s directive at minimum requires agency action designed to accommodate the legitimate interests of would-be intervenors with the need for orderly administrative processes.[125]

## VI

We find that appellants' Rule 10(b)(1) certificate qualifies as an efficacious notice of appeal in place of the earlier notice invalid for premature filing. We vacate IRS's decision to approve the disputed retroactive amendment because IRS failed to consider statutorily-mandated factors in its required inquiry into substantial business hardship. Finally, we hold that the agency's flat rule prohibiting intervention in Section 302(c)(8) proceedings contravenes Section 6(a) of the Administrative Procedure Act. The agency must therefore reconsider whether and upon what conditions it will permit public participation in such proceedings. We thus remand the case to the District Court with instructions to return it to IRS for further proceedings.

*So ordered.*

STARR, Circuit Judge, dissenting:

I respectfully dissent. In my view, the court's formalistic interpretation of

ERISA's section 303(b), 29 U.S.C. § 1083(b) (1982), unduly burdens the Internal Revenue Service in its treatment of proposed amendments and will do substantial harm to the workability of the statutory scheme crafted by Congress.[1]

## I

The court's interpretation of section 303(b)'s four-factor analysis is intuitively appealing, if only because it is straightforward. Based upon a perceived statutory command, the court requires IRS, in its decision to approve or disapprove proposed plan amendments, to engage (at minimum) in a boilerplate recitation of the impact of the four listed factors. In the court's not entirely unpersuasive view, the plain meaning of "shall" makes further analysis unnecessary.

I readily concede that my colleagues' reading of the statute is quite natural. But upon further analysis, especially of the statute's structure and purposes, the court's natural reading turns out to be the wrong reading. The Supreme Court has taught time and again that broader statutory purposes and the statute's structure may overcome even the most seemingly clear statutory command. *See Steelworkers v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979) ("It is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.'" (quoting *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892))); *cf. Young v. Com-*

---

**124.** Cf. *Office of Communication of United Church of Christ v. FCC, supra* note 108, 123 U.S.App.D.C. at 340, 359 F.2d at 1006 (holding that one or more of appellants must be granted standing to intervene on remand). We emphasize that a federal agency's obligation to facilitate public participation does not always, or even usually, require trial-type proceedings or other formal hearings. See *Citizens for Allegan County, Inc. v. FPC,* 134 U.S.App.D.C. 229, 232, 414 F.2d 1125, 1128 (1969); 1 K. Davis, *supra* note 112, § 8.11 at 565–566. Indeed, the framers of § 6(a) apparently anticipated more informal intervention. See Department of Justice,

*The Attorney General's Manual on the Administrative Procedure Act* 64 (1947).

**125.** Because we hold that the agency's denial of Nichols' intervention request infringed his right under § 6(a) of the Administrative Procedure Act, we do not reach the alternative claim that the agency's action contravened the Due Process Clause of the Fifth Amendment. See Brief for Appellants at 34–37.

**1.** I agree that the case is properly before us, and therefore concur in part III of Judge Robinson's opinion.

*munity Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (statutory command that agency "shall promulgate regulations" sufficiently ambiguous to allow agency to proceed by informal "action levels" rather than formal "regulations"). This is one instance in which, upon careful analysis, the structure and purpose of a statute speak more clearly than some of the words within it.

First, section 303(b)'s four enumerated factors are not even keyed to review of amendments to plans. The "substantial business hardship" test primarily governs *waivers* of minimum funding responsibilities for employers, *see* 29 U.S.C. § 1083(a), and was adopted only by reference to apply to amendments to plans. *See* 29 U.S.C. § 1082(c)(8) (1982). And the majority commendably concedes that applying section 303(b)'s enumerated factors to plan amendments makes no sense without "judicial construction." Maj. op. at 891 n. 83. The language of section 303(b) clearly contemplates analysis focusing on individual employers. The first factor, section 303(b)(1), refers to whether "the employer is operating at an economic loss," a consideration which is inapposite when the IRS is inquiring into the viability of a multi-employer plan. In order to make sense in the amendment context, the reference to "employer" must be read in the plural, thus turning section 303(b)(1)'s inquiry into something more akin to an industry-wide analysis. But this commonsense interpretation necessarily renders indistinct the four factors that the court requires IRS to examine. In the plan amendment context, the first three enumerated factors—all relating to the economic health of the industry—constitute premises for the ultimate conclusion, contained in the fourth factor, on which approval of the amendment properly hinges:

whether "it is reasonable to expect that the plan will be continued only if the [amendment] is granted." 29 U.S.C. § 1083(b)(4). As it should be, this fourth factor seems to be the ultimate consideration Congress had in mind. Separate consideration of each of the factors, it seems to me, would likely be repetitive and unnecessary in many instances.[2]

In addition to the difficulty in applying section 303(b)'s four-factor analysis to the amendment context, the structure of section 303(b) itself contemplates that the four factors will not necessarily be determinative. As the court candidly recognizes, Congress explicitly did not require that each of the four factors be present; what is more, Congress explicitly provided that IRS may consider whatever other factors it deems relevant. *See* 29 U.S.C. § 303(b) (stating that the factors to be considered include "but shall not be limited to" the four-factor analysis); *see also* H.R.Rep. No. 807, 93rd Cong., 2d Sess. 82 (1974) U.S.Code Cong. & Admin.News 1974, p. 4639 ("The determination of substantial business hardship is not to be limited to an examination of these factors, ... nor must all these factors be met for there to be a finding of substantial business hardship.")[3] As a result, today's decision creates a situation in which IRS may approve proposed amendments on bases entirely irrelevant to the four enumerated factors, but it nonetheless must indicate explicitly—most likely in a boilerplate fashion—that it considered each of the four factors. Failure to jump through these formalistic hoops, even if compliance would be burdensome for an agency already faced with a 90–day approval deadline, constitutes reversible error. This is an odd as well as unfortunate

---

**2.** The court also notes that Congress recognized the unworkability of the four-factor analysis in the multi-employer context. The majority cites as "significant" that the House Report, H.R.Rep. No. 779, 93rd Cong., 2d Sess. 25 (1974), omitted the first factor in its recitation of the IRS's responsibilities in determining substantial business hardship in this context. *See* Maj. op. at 891, n. 83.

**3.** That other factors may be considered is particularly relevant in this case. It scarcely requires stating that the asbestos industry is beset with the prospect of enormous potential liabilities, which, although not directly relevant to any of the four enumerated factors, undeniably spell deep trouble for the industry. It takes no great prescience to recognize that the very future existence of this industry is in substantial doubt, and along with the industry, its pension plans.

result of the court's rigid approach to statutory interpretation.

Along with the provisions of section 303(b) itself, other parts of the statute evince Congress' intent that IRS review be flexible and informal. Congress has, after all, put IRS in the position of having to take action within strict time constraints. *See* 29 U.S.C. § 1082(c)(8). Ninety days is not a very long time. The need for speed is no small matter, especially when, as must be the case if approval is warranted, the very viability of the plan is threatened if the amendment is not accomplished. The court disagrees, arguing that the burden of investigating and considering each of the four factors is slight, and discounting the significance of the normal review period of 90 days. In the majority's view, if 90 days is not long enough to do the agency's job, then regulations are in place for an extension until the job is properly done. *See* Rev.Proc. 79–18, § 7, 1979–1 C.B. 525, 527.

To be sure, IRS regulations provide for extensions, but they were certainly not intended to be routine, and until today were not so. I fear that today's holding will go a long way toward transforming the 90–day approval time in the ERISA context into what the 10–day reply time in the Freedom of Information Act context, *see* 5 U.S.C. § 552a(d)(2)(A) (1982), has become: a practical nullity. This transformation would be an unfortunate and unnecessary development, inflicted only by a wooden interpretation of the statute.

## II

With respect to the court's treatment of the intervention issue, I am satisfied that it is correct. The District Court's conclusion that ERISA preempted the otherwise applicable APA provision for intervention, *see* 5 U.S.C. § 555(b) (1982), cannot stand. The APA states explicitly that a "[s]ubsequent statute may not be held to supersede or modify this subchapter ... except to the extent that it does so expressly." 5 U.S.C. § 559 (1982). There being no express statement of preemption in ERISA, the agency is bound to allow interested parties to intervene "so far the orderly conduct of public business permits." 5 U.S.C. § 555(b). Under such a statutory command, the agency may not adopt a blanket rule, however reasonable, prohibiting intervention.

In light of my agreement with the court's judgment in this respect, I write only to emphasize the narrowness of today's holding: the court holds only that a *blanket prohibition* of intervention is impermissible. It does not hold that intervention is required in all or even most instances. In my view, by virtue of the constraints placed upon it by the 90–day deadline, the IRS in most instances will likely be well within its discretion in denying intervention. In each case, however, the agency is obliged to supply an adequate explanation of why intervention would be unduly burdensome.

## III

On a different front, I am troubled by one less obvious aspect of the court's treatment of this case, and thus add a brief comment. In Footnote 102 of its opinion, *see* Maj. op. at 895 n. 102, the court properly rejects IRS' argument that since the injury complained of was caused by plan trustees and not by IRS' approval of the plan amendments, the case presents no case or controversy under Article III. In IRS' view, because the amendments would have gone into effect had the agency not acted, the agency's affirmative steps did not work any harm to the plaintiffs. The court properly rejects this argument, for the harm alleged to have been caused by the agency's affirmative steps is sufficient to satisfy Article III's standing requirements (and Congress has provided by statute for judicial review). *See* 29 U.S.C. § 1132(a)(3) (1982).

To this point, I have no quarrel. But the court goes further and suggests that judicial review would have been available even if the agency had not acted within 90 days, and the amendments therefore had taken effect by operation of law. The majority states "[b]ecause the amendment could not be enforced absent submission to IRS and its explicit or *de facto* approval, appellants'

injury cannot reasonably be construed as springing solely from the actions of the trustees." Maj. op. at 895 n. 102 (emphasis added). The majority thus apparently believes that agency *inaction* resulting in approval of amendments is amenable to judicial review, and seemingly so holds.

For my part, the issues of whether Congress provided for judicial review of *de facto* approval of amendments or whether such a cause of action can properly be implied, are fraught with difficulty. However, because the agency affirmatively approved the amendments in this instance, these questions are not part of the case before us. As a result, any statements as to the reviewability of *de facto* approvals of plan amendments constitute no part of today's holding.

### IV

A final observation. If the administrative process, as Congress has fashioned it, takes time, so be it. But in the context of ERISA plan amendments, the substance of the statutory scheme is thwarted, not advanced, by delay. Beneficiaries are adequately protected by judicial review—easily obtained—following IRS approval. IRS approval is intended to be expeditious, focusing primarily on whether a proposed amendment is justified by economic necessity, while judicial review properly focuses on substantive legal issues, such as questions concerning fiduciary duties. Today, the court frustrates this sensible structure by imposing delay at the administrative level to the detriment of all concerned. The judicial branch is well-advised to give credence not only to individual words within a statute, but to reflect upon and give life to the statute's structure and purpose. Because the court fails to discern what I am satisfied is Congress' intent, I am constrained respectfully to dissent.